**HOSPITAL AUTHORITY OF FLOYD COUNTY, GEORGIA, Plaintiff,**

v.

**Richard SCHWEIKER, Secretary of Health and Human Services, Defendant.**

Civ. A. No. C80–215R.

United States District Court,
N. D. Georgia,
Rome Division.

Sept. 16, 1981.

James D. Maddox, Jackson B. Harris, Smith, Shaw, Maddox, Davidson & Graham, Rome, Ga., for plaintiff.

William L. Harper, U. S. Atty., Jere Morehead, Asst. U. S. Atty., Atlanta, Ga., Jeanne Schulte Scott, Dept. of Health and Human Services, Washington, D. C., for defendant.

## ORDER

HAROLD L. MURPHY, District Judge.

In the summer of 1966, this nation embarked on a revolutionary venture to provide health care to the elderly and disabled through the Medicare Program. 42 U.S.C. §§ 1395 *et seq.* This action involves Part A of that program (42 U.S.C. §§ 1395c— 1395i–2) which provides hospital insurance benefits to qualified recipients. Under Part A, a hospital (or other defined provider) is reimbursed for the "reasonable cost" of providing services to a qualified individual. 42 U.S.C. § 1395f(b). In exchange, the hospital agrees not to bill the patient for any covered services. "Reasonable cost" is defined in the act as,

> "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and

shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services . . . ."

42 U.S.C. § 1395x(v)(1)(A).

The plaintiff in this action is a public, non-profit hospital. The hospital has sought an allowance for a reasonable return on equity capital. The regulations promulgated by the Department of Health and Human Services provide that a return on equity capital is allowed to a *proprietary* hospital. 42 C.F.R. § 405.429. This regulation was generated by the 1966 amendments to the Medicare Act, P.L. 89–713, which added 42 U.S.C. § 1395x(v)(1)(B) to the existing Act:

> [The regulations defining "reasonable cost"] in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital. . . .

The plaintiff filed its Medicare Cost Report for the fiscal year July 1, 1977 to June 30, 1978, claiming $272,115 as its return on equity capital. Following the rejection of this claim, the plaintiff appealed to the Provider Reimbursement Review Board which held that a return on equity capital was not an appropriate item to be included as a cost of doing business for a nonprofit Medicare Provider. On September 29, 1980 the Deputy Administrator of the Health Care Financing Administration declined to review that decision. This action followed. Pending are cross motions for summary judgment.

The plaintiff argues that a careful reading of the legislative history of the Medicare Act compels a finding that Congress intended both proprietary and non-proprietary hospitals to be eligible for an allowance for a return on equity capital. Plaintiff urges the Court to find that the Secretary of Health and Human Services has violated the legislative mandate by refusing the claim of Floyd Medical Center for a reasonable return on equity capital.

The plaintiff's basic argument attacks the validity of 42 C.F.R. § 405.429, insofar as it impliedly prohibits nonprofit hospitals from obtaining a return on equity capital. Plaintiff contends that the Secretary's actions in promulgating the regulations are arbitrary, capricious, an abuse of discretion, not in accordance with law (42 U.S.C. § 1395), in excess of statutory authority, and an unlawful withholding of agency action. In addition, the plaintiff asserts that the regulations violate the Hospital's right to due process and equal protection.

Since the plaintiff's argument is predicated primarily on the Medicare Act's legislative history, a careful review of the relevant materials is necessary. First, a skeletal review of the chronology of legislative and regulatory actions will be set out.

The Medicare Act was signed into law by President Lyndon Johnson in July, 1965 with an effective date of July, 1966. In May of 1966 two months before the Program began, the Senate Finance Committee held hearings on the question of reimbursement guidelines, *Reimbursement Guidelines for Medicare: Hearing before the Committee on Finance*, United States Senate, 89th Cong., 2d Sess. (Comm. Print, May 25, 1966) (hereinafter "Hearings"). At these hearings, there was some discussion surrounding the issue of providing a return on equity capital to both proprietary and public providers. See *infra*. Also discussed was the Secretary's decision to provide an additional 2% of total allowable costs as compensation for otherwise unspecified costs including a return on equity capital. This 2% rule was officially proposed by the Secretary on June 2, 1966. 31 Fed.Reg. 7871 (June 2, 1966).

On October 19, 1966, the amendment to the Medicare Act which added § 1395x(v)(1)(B) was approved. This amendment, quoted above, provided that proprietary extended care facilities be allowed a return on equity capital. The Conference Report specifically directed the Secretary to apply the same principle to proprietary hospitals. H.Rep.No.2317, 89th Cong., 2nd Sess., p. 31 (Oct. 19, 1966).

One month later, the 2% rule went into effect. However, rather than a blanket 2% for all providers, the regulation granted only 1–1½% to proprietary hospitals, expressly recognizing the allowance provided to proprietary facilities under § 1395x(v)(1)(B) (and the regulations implemented pursuant to that section, § 405.429). 20 C.F.R. § 405.428 (redesignated Title 42 in 1977). 31 Fed.Reg. 14808 (November 22, 1966).

Three years later, in June, 1969, the Secretary dropped the 2% and 1–1½% allowance altogether. 34 Fed.Reg. 9927 (June 27, 1969).[1] What is left, then, is only § 1395x(v)(1)(A) providing for "reasonable cost" reimbursement, and § 1395x(v)(1)(B) and its regulatory counterpart, § 405.429. Proprietary facilities receive a return on equity capital, public providers do not. No provider receives any kind of 2% or 1½% "bonus."

After methodically reviewing the delphic Senate Finance Committee Hearing transcript, the plaintiff contends that Congress envisioned a reimbursement scheme which provided a return on equity capital to all Medicare providers. It must be remembered that these Hearings were held nearly a year *after* the Act was signed into law. Such post-enactment history is not the surest guide of the legislative intent in initially passing the Act. *Cf. Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074 (5th Cir. 1974). Nevertheless, the testimony of the witnesses and the remarks of the Senators are quite instructive.

Robert Ball, then the Commissioner of Social Security, testified that the Health Insurance Benefits Advisory Council recommended that no allowance for a return on equity capital be provided—to any provider—but that if an allowance were made, it should apply to both proprietary and non-profit institutions. Hearings, 47–48. Subsequently, he referred to the 2% allowance:

The 2 percent allowance provided for in our principles does the same thing. It is not a bonus but a part of basic cost. The allowance is limited to an amount which might be justified as a minimum return for the use of equity capital, as discussed earlier . . . . The 2 percent allowance applies alike to profit and nonprofit organizations. Thus the principles avoid the anomalous result that would arise from reimbursing a profitmaking organization more than a nonprofit organization for rendering exactly the same service—solely by reason of allowing return on investment in one case but not the other.

Hearings, at 56. He noted that the 2% bonus was necessary to ensure that the basic Medicare reimbursement policy be accomplished: "we are to pay the full cost for medicare patients so that none of the cost of services to them will fall on nonmedicare patients and vice versa." *id.* at 55. Subsequently, when the subject of providing a return on equity investment arose, Mr. Ball and Mr. Willcox (General Counsel of Social Security) stated that a return was provided "as some bit of this 2% item." *id.* 107. The 2% allowance also reflected the fact that the average per diem did not take into account the higher costs of providing medical services to the elderly. *id.* Again, Mr. Ball testified near the conclusion of the hearing that the 2% allowance reflected the higher cost of treating the elderly, the need to provide at least some reimbursement for replacement costs, and a return on equity capital. *id.* at 120. None of these factors was explicitly provided for in the proposed regulations, and the 2% allowance was designed to cover what, in the opinion of the Commissioner, were actual costs.

---

1. No notice period, or comments were received when the Secretary repealed the 2% allowance. The Federal Register prefaced the amendment with the following language:

    This amendment is prepared to conform to the Department of Health, Education, and Welfare budget policy for fiscal 1970 in implementation of the President's Review of the 1970 Budget which was released on April 15, 1969, by the Executive Office of the President. For this reason, it is determined that compliance with the notice, public procedure, and effective date requirements of the Administrative Procedure Act, 5 U.S.C. 553, is unnecessary.

There is no statement by any Senator that Mr. Ball's analysis reflected the intent of the Committee or the Congress. Senator Douglas did indicate that he would approve making a return on equity investment, but his statements suggest that he regretted that an express provision for an allowance for return on equity capital was not included in the proposed rules. Hearings at 106–108. From Mr. Ball's testimony it is evident that the 2% allowance included—in some indeterminate amount—a return on equity capital. At the same time, it was often repeated that the Council had decided that a return on equity capital should not be provided at all during the first year at least. The Senate Committee, in short, was being told by the Commissioner that no return on equity capital was allowed explicitly, but that a return on equity capital was discreetly included in the 2% allowance.

Within months, the Act was amended to explicitly provide for a return on equity capital to proprietary facilities. § 1395x(v)(1)(B). Senator Long stated that the amendment was needed because the proposed regulations did not provide for a return on equity investment. Cong.Rec. 27608, 10/19/66. The government relies on this statement of Senator Long to show that Congress did not intend for all providers to be reimbursed for a return on equity capital. The plaintiff contends that Senator Long—who was present at the hearings—merely wanted the provision for a return on equity capital to be *explicit* as it applied to long term care facilities. In § 1395x(v)(1)(B), Congress specifically provided that the allowance granted by that section would be "in lieu of other allowances to the extent that they reflect similar items," that is, the 2% allowance.

■ Having traced the footprints on the trail of legislative enactment, the Court concludes that it was not the intent of Congress to provide an allowance for a return on equity capital to all facilities. In reading the transcript of the Senate hearing, it is apparent that the Committee basically approved the Secretary's proposal to table the issue of providing such an allowance. This is what the Health Insurance Benefits Advisory Council recommended, and this recommendation was passed on to the Committee. The decision to amend the Act in October, 1966 to provide for the allowance for proprietary facilities evidences Congressional intent to reverse the former policy of simply obscuring the allowance as a "bit" of the 2% allowance.

The exchanges at the Hearing between various Senators and Mr. Ball and other administrative officials make it quite unequivocal that the Senate Committee members believed that a return on equity capital was not, and should not, be provided. For example:

THE CHAIRMAN [Sen. Russell B. Long]. But did you have the impression anywhere that the congressional intent was that we should have allowed imputed interest on capital?

MR. MYERS [Chief Actuary, Social Security Administration]. No. In making the cost estimates, I had no thought that that would be done.

THE CHAIRMAN. What we are talking about is an item neither you nor we had any idea of allowing. I never had an idea we were going to allow imputed interest. Nobody, so far as I know, in your Department—did your Department have any idea that we were going to allow imputed interest?

MR. BALL. No, Mr. Chairman. And I think one of the main reasons that the staff resisted the tendency of the Health Insurance Benefits Advisory Council to move to this position was not necessarily on the merits of the economic argument, but the fact that it had not been considered, and that it therefore ought to be postponed. That was the thought there.

. . . . .

MR. BALL. Senator, I think the language of the law "reasonable cost" is open to a great variety of interpretations. The discussion, the legislative history, the committee report, pinned that down considerably . . . . I was answering literally the question of whether the term "reasonable cost" could have included such things [e. g. return on equity capital].

But I don't think it would have been reasonable to so interpret the term in the light of the discussions and the legislative history.

. . . .

SENATOR WILLIAMS. In computing the costs incurred, how can you get an estimate for interest which is not owed, not paid? How can you get an allowance for an interest charge not owed and not paid, if you are going to stick to the formula of actual costs incurred?

MR. BALL. We did not accede to this argument for allowing an interest return on equity capital.

Hearings, 49–51.

MR. COHEN [Under Secretary]. I think the point, Senator, is that Congress did, in setting up the concept of reasonable cost, intend for us to reflect what the economic cost of hospital care was. And as Mr. Gordon says, if you were going to pay for the interest on borrowing the money it seems to us to be reasonable to try to reflect in the cost what is actually the incurred cost of a hospital when it has to operate. So while it was not discussed in those specific terms, I think it is absolutely consistent with the intent of Congress that what the program should pay should really reflect what the economic cost is for a hospital in providing these services.

SENATOR ANDERSON. I just could not disagree with you more. We discussed this over and over and over again, and rejected that in the committee. I just call your attention to the committee report, page 33:

The cost of hospital services varies widely from one hospital to another, and the variations reflect differences in quality and cost. The same thing is true with respect to the cost of services provided. The provision in this bill for the payment of reasonable cost of services is intended to meet the actual cost.

"Actual." This is not economic or fanciful or anything else. We put it in there so they could not bring in the various things you are talking about now. How do you get around this?

MR. COHEN. Well I think this is the actual cost. I think when you are talking about economic costs—

. . . .

SENATOR ANDERSON. Just one more question from page 37 of the report which I think should have some importance to you. I really believe when a committee goes to the extent of preparing a report, and filing it, and telling the Congress and the people that this is what they mean, it is wrong to try to reinterpret it some other way.

In paying reasonable cost, it should be the policy of the insurance program to so reimburse a hospital or other provider that an accounting may be made at the end of each cost period for costs actually incurred.

Not beneficiarily incurred, or anything else—"actually incurred." And if you don't pay interest on a debt, that is not a cost that it actually incurred.

*id.* at 69–70.

At the outset of the hearing, Senator Long, the Chairman, outlined the various topics to be discussed:

Three. Can the reasonable cost include a return on investment for proprietary institutions without a similar payment to the nonprofit facilities. And that is a fair question to be raised. It seems to me that it was intended that there should be a return on investment to proprietary institutions—and that there is no similar requirement that they be made to public or nonprofit groups.

*id.* at 43.

In addition, when the Act was amended in October, Congressman John W. Byrnes of Wisconsin stated, "[Under existing law] the amount that will be paid to the individual nursing home or facility—shall be, and I quote, 'the reasonable cost' of furnishing such care. In other words, as the law now stands, fundamentally all the Social Security Administration can pay are the costs, with no allowance for profits or a return on the invested capital." 112 Cong.Rec. 28220

(1966). Senator Long made a similar statement to the Senate, "As the proposed Medicare regulations stood [an investor] would only have been reimbursed for the actual costs of providing services with no specific return given on his investment." 112 Cong. Rec. 27608 (1966).

Despite the Senators' adamant refusal to accept the notion that a return on equity capital should be provided, it is equally clear that the Senate Committee acknowledged that the 2% allowance embraced the concept of a return on equity capital. The "in lieu of other allowances to the extent that they reflect similar items" clause in § 1395x(v)(1)(B) removes any doubt as to whether Congress recognized this component of the 2% allowance. See supra p. 572. But the decision to amend the Act in October signalled Congressional dissatisfaction with the dissemblance of the return in the 2% allowance, and evidenced the manifest intent of Congress to discriminate between proprietary and non-proprietary facilities.[2] Following the enactment of § 1395x(v)(1)(B), proprietary facilities received a return on equity capital in a manner which sought to reflect what the actual return should have been. Nonprofit facilities, however, continued to receive simply the 2% allowance which reflected an amalgam of uncalculable factors. With respect to the return on equity capital, the "bit" of the 2% allowance which was allocated as such a return allowance was simply arbitrary: there was no effort to calculate what investment there was, or what the return should be. There can be no question, then, that by the end of 1966, Congress had decisively acted to differentiate between public and proprietary hospitals.

▪ The Secretary's decision to abandon the 2% allowance (and with it, whatever "bit" was intended as an allowance for a return on equity capital) did not violate the spirit or the letter of Act. The Hearing report is replete with justifications for treating public and proprietary hospitals in a different manner. For example, in the Report prepared by the Senate staff, it was observed that an allowance for a return on equity capital "to non-profit hospitals built with Hill-Burton funds involves a "profit" on, and a pyramiding of, Federal money. Philosophically, this may be unsound." Hearings, at 24. See also id. p. 37–34. In addition, a report issued by the General Accounting Office observed that an allowance for a return on equity capital would have different consequences for proprietary and nonprofit facilities. While not specifically disapproving of such an allowance for nonprofit hospitals, the report spells out the different considerations which are involved in providing such an allowance to different types of facilities. Hearings, at 144–150.

Both the staff report and the G.A.O. report were available to the Finance Committee. Congress was certainly aware that providing an allowance to proprietary and nonprofit facilities involved different considerations. The heated debate over the constituent elements of the 2% allowance— and particularly the return on equity capital "bit"—occurred only five months prior to the October amendment. By specifically providing an allowance to proprietary facilities while ignoring nonprofit facilities, Congress revealed its intent to treat the dissimilar facilities differently. Expressio unius est exclusio alterius; expressum facit cessare tacitum.

Although there are numerous maxims employed in resolving questions of statutory construction, the technique prescribed by Justice Frankfurter—the "threefold imperative"—is the surest method: (1) Read the statute; (2) read the statute; (3) read the statute!" H. Friendly, Benchmarks, 202 (1967). The statute provides for an allow-

---

2. Congressman Byrnes recognized this discrimination:

> MR. BYRNES of Wisconsin. Mr. Speaker, I believe you will find that after the adoption of this conference report the proprietary nursing home will be paid on one basis and the nonprofit will be paid on a different basis.

> There will be legitimate criticism from nonprofit institutions, because here we fix in the statute, discrimination between the manner in which we treat the two types of organizations.

112 Cong.Rec. 28221 (1966).

ance to proprietary facilities and does not mention nonprofit facilities. Congress could have provided no clearer compass as a guide to its intent.

The 2% allowance was discontinued over twelve years ago. Since that time, proprietary facilities have received an allowance for a return on equity capital, and nonprofit facilities have not. Congress has amended the Medicare Act substantially since that time, but has left intact § 1395x(v)(1)(B). *See e. g.*, P.L. 92–603 (1972). If Congress intended proprietary and nonprofit facilities to receive an allowance for a return on equity capital, an amendment to § 1395x(v)(1)(B) easily would have accomplished this result. The failure to amend that section vindicates the Secretary's decision to provide the allowance only to proprietary facilities. *Cf. Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965) ("Under some circumstances, Congress' failure to repeal or revise in the face of such administrative interpretation has been held to constitute persuasive evidence that that interpretation is the one intended by Congress."); *Kay v. Federal Communications Commission*, 443 F.2d 638, 646–47 (D.C.Cir.1970) ("Congress, of course, is not required to act each time a statute is interpreted erroneously and legislative silence in the face of such interpretation is not necessarily equivalent to legislative approval. However, a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not changed by it, is almost conclusive evidence that the interpretation has congressional approval." [footnotes omitted]); *Reeb v. Economic Opportunity Atlanta*, 516 F.2d 924 (5th Cir. 1975).

Furthermore, even if the intent of Congress were wholly undecipherable, the broad authority and discretion conferred on the Secretary by Congress to promulgate regulations in this field compels an added measure of deference to his conclusions. In *Springdale Convalescent Center v. Mathews*, 545 F.2d 943 (5th Cir. 1977) the court expounded on the Secretary's authority:

The precise methods to be used in determining how much a provider is to be reimbursed for its services, triggered a great deal of Congressional debate and delayed passage of the Act for more than a decade.... Congress ultimately chose not to specify any rigid formulae. Rather it established general statutory guidelines under section 1395x(v)(1)(A) and authorized the Secretary to "prescribe such regulations as may be necessary to carry out the administration of the [Act] ..." 42 U.S.C. § 1395hh. The validity of the Secretary's regulations "will be sustained so long as [they are] 'reasonably related to the purposes of the enabling legislation' ...." ... Because the Secretary's interpretation of the statutory scheme is entitled to "considerable deference." *Florida v. Mathews*, 526 F.2d [319] at 323 n. 10, *Springdale* has the "difficult burden" of proving that the Secretary's regulation conflicts with the statutory scheme. *Id.* at 323. This has also been described as a "heavy burden." *Johnson's Professional Nursing Home v. Weinberger*, 490 F.2d [841] at 844.

*id.* at 951. It is indisputable that the Secretary's interpretation of the Act does not conflict with the express statutory scheme; the regulations are certainly related to the purpose of the enabling legislation.

■ Finally, the plaintiff argues that the regulations violate the equal protection and due process clauses of the Fifth and Fourteenth Amendments. No cases are cited in support of this argument, and the plaintiff obviously places little reliance on this theory. Of course, the Fourteenth Amendment has no relevance since no state action is involved in this matter. The statutory scheme and the regulations would violate the Fifth Amendment only if they lack a rational basis. *Cf. Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Both the Senate Finance Committee staff report and G.A.O. report outline various reasons why profit and nonprofit institutions should be treated differently. Nonprofit institutions have various benefits which are una-

vailable to proprietary institutions: tax benefits, Hill-Burton grants, charitable donations, and numerous other advantages created by the state and federal governments. As one court observed,

Plaintiff maintains that this discrimination against not-for-profit providers violates equal protection and due process. These regulations allow a return on investment to profit but not to nonprofit institutions. This is tantamount to saying the regulations provide for profit to profit institutions but not to nonprofit institutions. Surely such a classification has a rational basis that will satisfy *Salfi*, 422 U.S. at 770 [95 S.Ct. at 2469]. It is certainly rational that profit institutions receive this advantage when nonprofit institutions receive numerous other advantages, such as various grants and contributions, and tax-exempt status.... The distinction between profit and nonprofit institutions violates nothing in the fifth amendment. *See Am. Med. Int'l. Inc. v. Sec. of H. E. W.*, 466 F.Supp. 605, 615 (D.C. Dist. of Columb.1979) [; *aff'd*, Civ. No. 79–1460 (D.C.Cir. Aug. 14, 1981)].

*Caylor-Nickel Hospital, Inc. v. Califano*, Civil No. F 77–83 (N.D. Indiana, March 1, 1979) at page 12; ¶ 30,718 CCH Medicare & Medicaid Guide.

The parties in this case have provided the Court with extremely well-prepared and scholarly briefs. The issue is obviously of great importance to both the Department of Health and Human Services and to public hospitals throughout the nation. Unfortunately, this Court is neither equipped nor authorized to make the complex policy decisions involved in establishing reimbursement guidelines under the Medicare program. The Court has decided simply that the regulations promulgated by the Secretary do not conflict with the statutory scheme, and are not Constitutionally infirm. Whether the regulations or the statute should be changed are matters which must be addressed to the appropriate branch of government.

ACCORDINGLY, plaintiff's motion for summary judgment is DENIED; defendant's motion for summary judgment is GRANTED.