SALINE COMMUNITY HOSPITAL
ASSOCIATION; Sinai Hospital of
Detroit, Plaintiffs,

v.

Richard S. SCHWEIKER, as Secretary of
Health and Human Services, et
al., Defendants.

W.A. FOOTE MEMORIAL HOSPITAL,
INC., Plaintiffs,

v.

Richard S. SCHWEIKER, et
al., Defendants.

Civ. A. Nos. 81–60059, 81–60128.

United States District Court,
E.D. Michigan, S.D.

Jan. 14, 1983.

Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for plaintiffs.

Ellen Ritteman, Asst. U.S. Atty., Detroit, Mich., Jeanne Schulte Scott, Atty., Dept. of Health & Human Services, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOINER, District Judge.

The plaintiffs in this action are three non-profit hospitals that seek declaratory and injunctive relief against the Secretary of Health and Human Services for denying their claim for return on equity capital for

the cost reporting year 1979 under the Medicare Act and regulations.

The Medicare Program, begun in the summer of 1966, provides hospital insurance benefits to the elderly and disabled. Under the Medicare Act, 42 U.S.C. §§ 1395 *et seq.,* providers who participate in the program are reimbursed for "the lesser of (A) the reasonable cost of such services... or (B) the customary charges with respect to such services...." 42 U.S.C. § 1395f(b)(1). The program is voluntary in that providers elect to participate and in doing so agree not to bill the Medicare patient for any of the services covered.

Each plaintiff timely filed a cost report for its 1979 fiscal year cost reporting period as required by Medicare regulations, 42 C.F.R. § 405.453(f). After timely filing its cost report, but before the fiscal intermediary had made its final determination of the amount of reimbursement due and before it had issued a notice of program reimbursement, each hospital filed an amended cost report with its fiscal intermediary requesting reimbursement for return on equity capital. In each case, the fiscal intermediary denied the request for reimbursement for this item on the merits. The plaintiffs appealed to the Provider Reimbursement Review Board, which dismissed the appeals on jurisdictional grounds.

This action was filed in April of 1981 and consolidated with a similar case involving W.A. Foote Memorial Hospital in April of 1982. The Secretary filed a motion to dismiss when the case was before Judge Feikens and the motion was denied. A similar motion for summary judgment or, in the alternative, for remand was heard and denied by this court. The Secretary's motion for summary judgment based on the merits of the case was also denied.

The matter was tried and the plaintiff hospitals had an opportunity to present evidence regarding return on equity as a cost. This decision is based on the record in this case and the evidence presented at trial.

The hospitals make two arguments:

1) That return on equity is both a "reasonable" and a "direct or indirect" cost as defined by the act and that the Secretary's regulations prohibiting payment for return on equity to non-profit hospitals causes the hospitals to shift this cost from Medicare patients to non-Medicare patients which is expressly prohibited by the act, 42 U.S.C. § 1395x(v)(1)(A).

2) That denying non-profit hospitals reimbursement for return on equity when proprietary hospitals are allowed this cost violates the Equal Protection Clause of the Fifth Amendment.

*Return on Equity and Cost Shifting*

The hospitals say that a return on equity capital is a reasonable cost under the Medicare Act and that the Secretary's refusal to reimburse non-profit hospitals for this cost is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law...." Administrative Procedures Act, 5 U.S.C. § 706.

The Secretary argues that he is precluded from reimbursing non-profit hospitals for this item because it is not an allowable cost under the Medicare Act as evidenced by the legislative history.

"Reasonable cost" is defined in 42 U.S.C. § 1395x(v)(1)(A), which provides in part:

The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; ... Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods

of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered. At present the Secretary does not reimburse non-profit hospitals for return on equity. Under the regulations, return on equity is an allowable cost for proprietary providers only. 42 C.F.R. § 405.429.

Return on equity capital is a return on the capital assets or capital investment of an organization. Equity is the excess of assets over liabilities.

The hospitals presented expert testimony that a reasonable return on equity is a cost for businesses generally, and all hospitals in particular, for a variety of reasons. First, return on equity is necessary as a reserve to provide for future capital investment. Depreciation paid by Medicare only reflects the original cost of investment, and is not sufficient to cover the additional expense of replacing capital assets caused by inflation. Unless a hospital is able to generate a return on equity it cannot replace capital assets without incurring debt. The example given by Professor Silver, witness for the plaintiff, was a $100 asset at a 15% inflation rate. In ten years it would cost $400 to replace the asset. In order to maintain capital intact, the hospital must have the additional $300 of equity returned. Even if the hospital invested the funds it obtained for depreciation, this would not be sufficient to provide the $300 needed because of varying interest rates and because depreciation is spread over the useful life of the asset and recovered accordingly.

Second, return on equity is necessary to allow hospitals to enter the debt market and borrow funds to finance capital investment. This is because lenders require that borrowers have significantly more money generated from their operations than the minimum necessary to cover repayment of indebtedness. This margin is called debt service coverage. Professor Silver testified that lenders require hospitals seeking financing in the bond market to demonstrate that they have sufficient revenues to repay

the debt, allowing some margin for error. All of this is translated into a figure referred to as the debt coverage ratio. The ratio is obtained by subtracting expenses from revenue and dividing the excess by the premium plus the interest on the debt.

Mr. Michael Hernandez, plaintiff's expert on investment banking and Vice President of Kidder, Peabody & Company, testified that the minimum average coverage ratio for hospitals able to get financing in the bond market, which is the relevant market for non-profit hospitals, is now 2.1 to 1. The ratio affects the hospital's bond rating which in turn affects the marketability of the hospital's bonds and ultimately its ability to raise capital. Return on equity represents a substantial portion of debt service coverage and, consequently, affects the coverage ratio and resultant bond rating. Mr. Hernandez testified that reducing return on equity to zero would make it extremely unlikely that a hospital could get financing.

Mr. Hernandez also testified that hospitals which have a high percentage of revenue derived from Medicare tend to receive a lower bond rating, *i.e.*, the investment community views the hospital's bonds as being a less sound investment. This is partly due to the fact that Medicare does not pay return on equity.

Third, even hospitals financing investment out of conventional operations need return on equity to provide a "risk premium" to cover the possibility of lower revenues or higher costs than predicted in their financial projections.

The problem of inflation and replacing existing assets is further compounded by the need to make the institution more efficient through capital expenditures and the need to compete in attracting physicians and patients by providing quality care. The ability to compete is related to the ability to keep up with technological advances in health care delivery. Technological advances also make it often impossible to replace a particular asset with an equivalent item at an equivalent cost.

The debt service coverage problem is aggravated by the fact that the ratio of debt to capital expenditures for non-profit, acute care hospitals has risen from 40% in 1968 to 71% in 1980. It is estimated that this figure will increase to 81% in 1989. Therefore, hospitals which cannot maintain a sufficient debt service coverage ratio will be unable to finance 80% of their capital needs. Mr. Hernandez estimated that, if conditions remain the same, in ten years one-half of the hospitals would be unable to borrow.

Charitable contributions accounted for only 6.5% of the total amount spent for construction for non-profit hospitals in 1979 and the percentage figure appears to be decreasing. Contributions, as well as being sporadic and undependable, tend to be for new capital and to be directed toward specific uses and, therefore, do not assist with the return on equity problem, since return on equity relates to existing capital. Further, Mr. Hernandez projected that the combined funds available to non-profit hospitals from governmental aid and charitable contributions will meet only approximately 3% of the total capital requirements for non-profit hospitals in the 1980's.

These generalized problems have occurred in the plaintiff hospitals. Sinai has been unable to fund a significant amount of its needed capital expenditures, despite the aging nature of its facilities in the late 1970's. This was due to the fact that Sinai did not earn a positive return on equity until 1979.

Foote issued $51.4 million in bonds in 1980 to finance construction of a $60 million replacement facility begun in 1978. Foote would not have been able to finance this replacement had it not earned a return on equity sufficient to support the debt service coverage ratio needed in 1980 for a successful bond issue. The replacement facility being constructed by Foote was required in part to remedy various building and Joint Commission on Hospital Accreditation code violations at the old Foote facilities.

All of this demonstrates that the plaintiff hospitals, like all hospitals, profit or non-profit, require return on equity in order to maintain their capital assets and to avoid eventual financial insolvency. Consequently, return on equity is a necessary cost of doing business for each of the plaintiff hospitals.

In order to obtain a return on equity, the plaintiff hospitals have had to increase their overall patient charges. Not all patients pay the amount actually charged by the hospitals. Since Medicare only reimburses the hospital for costs as defined by the Medicare Act and regulations and since Medicare will not reimburse non-profit hospitals for return on equity, the actual amount received for Medicare patients is substantially less than the amount charged other patients. Blue Cross-Blue Shield reimburses hospitals for its patients on a related formula but does pay some percentage figure that represents the return on equity cost attributable to Blue Cross patients. Other patients pay full charges, either themselves or through their insurance. As an example, a hospital might have 40% Medicare patients, 40% Blue Cross patients, and 20% other patients. Blue Cross pays its share of return on equity only. The charges paid by the 20% other category of patients reflect both the return on equity attributable to them and that attributable to Medicare patients. In effect, the 20% pay 60% of the total return on equity needed by the hospital.

At Sinai in 1979 charges to hospital patients averaged $369.74 per patient day while payments for Medicare patients were $266.85 per patient day. For the years 1975 through 1978 Sinai had earned no return on equity. Sinai now sets charges so that it can earn a four to six percent return on net revenue to provide it with return on equity so that it can maintain its facilities.

At Foote Hospital the average charges per patient day in 1979 were $226.91 and Medicare reimbursable costs per patient day were $171.43. Foote had 34% of its patients in the other category, paying full charges. In 1979 Sinai had only 18.2% of its patients in the category paying full charges. Both had 31–32% of their patients on Medicare.

The plaintiff hospitals argue that return on equity is a reasonable cost under the Medicare Act and that the Secretary is violating the provision in the act that says costs shall not be shifted from Medicare patients to non-Medicare patients.

Such regulations shall (i) take into account both direct and indirect costs of providers of services ... in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered. . . .

42 U.S.C. § 1395x(v)(1)(A).

■ Clearly there is a shifting of costs to patients not covered by Medicare. The question, however, is whether the costs shifted are those covered by the Medicare Act. Section 1395x(v)(1)(A) makes it clear that the costs that are not to be shifted are those that are covered as "reasonable costs" under the act. Consequently, shifting the costs of return on equity to non-Medicare patients is a violation of the terms of the statute only if return on equity is an item of cost intended by Congress to be reimbursable under the act.

The Secretary argues that the Medicare Act does not recognize return on equity as either a direct or indirect cost of providing current care to Medicare beneficiaries for non-profit charitable hospitals. The Secretary offered no real evidence to refute the testimony of the plaintiffs' experts and agrees that return on equity may be a principal factor in a hospital's ability to accumulate the necessary funds to replace existing facilities and to expand new services, programs and technology. It is the Secretary's position, however, that Congress did not intend to provide funds to replace existing facilities or to expand new services, programs and technology for non-profit hospitals under the Medicare Act. A careful reading of the act and whatever legislative history is available supports the Secretary's position.

When Medicare was originally enacted in 1965, Congress did not directly address the question of return on equity and whether it was part of the actual and reasonable costs that were to be paid under Medicare. This particular item was not discussed until the Secretary produced the proposed regulations prior to the effective date of the act. In the proposed regulations the Secretary recommended that Medicare pay a 2% plus factor above the reasonable costs determined under the regulations. It was the Secretary's position that the 2% allowance was necessary to insure that the program adequately reimbursed the hospitals. In response to the proposed regulations, the Senate Finance Committee held hearings in May of 1966 to discuss questions it had with respect to the proposed guidelines for reimbursement, *Reimbursement Guidelines for Medicare: Hearing before the Committee on Finance,* United States Senate, 89th Cong., 2d Sess. (Comm. Print, May 25, 1966) (hereinafter "Hearings"). There was some discussion at the hearing about providing return on equity and about the 2% allowance.

■ The record of the Hearings is, of course, not contemporaneous legislative history of the Medicare Act. The post-enactment history of any legislation is not conclusive as to Congressional intent. *Regional Rail Reorganization Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The Hearings do, however, give some indication of the perception of individual Senators regarding which costs the program was intended to cover. The Hearings also make it clear that the Secretary had considered return on equity when designing the 2% allowance.

■ Discussion at the Hearings as well as the report issued by the staff of the Finance Committee which prompted the Hearings indicate that there was substantial concern and dissatisfaction on the part of the committee with the proposed guidelines, particularly with the 2% allowance. *See* "Proposed Medicare Reimbursement Formula: Congressional Intent, Policy and Costs—Report of the Staff of the Committee on Finance" (May 16, 1966), reprinted in *Hearings, supra.* The report was con-

sidered by the committee, read into the record of the Hearings, and referred to at the Hearings.

The report specifically challenged the 2% allowance because it decreased incentive to control costs, because it added to the cost estimates for the program, and because it included an unidentified portion for return on equity for non-profit hospitals as well as proprietary hospitals. The report lists a number of reasons for distinguishing between profit and non-profit hospitals.

At the Hearings various Senators challenged the 2% allowance as including reimbursement for items never discussed or approved by Congress. For example:

> SENATOR ANDERSON.... There is nothing anywhere in the hearings that indicates the allowance of 2 percent would ever be considered. I have had people search the record, I have read back myself. I cannot find anything about that, anywhere. Yet you have agreed to it because the hospitals put pressure on you.

> MR. COHEN. I think the point, Senator, is that Congress did, in setting up the concept of reasonable cost, intend for us to reflect what the economic cost of hospital care was. And as Mr. Gordon says, if you were going to pay the interest on borrowing the money it seems to us to be reasonable to try to reflect in the cost what is actually the incurred cost of a hospital when it has to operate. So while it was not discussed in those specific terms, I think it is absolutely consistent with the intent of Congress that what the program should pay should really reflect what the economic cost is for a hospital in providing these services.

> SENATOR ANDERSON. I just could not disagree with you more. We discussed this over and over and over again, and rejected that in the committee. I just call your attention to the committee report, page 33:

>> The cost of hospital services varies widely from one hospital to another, and the variations reflect differences in quality and cost. The same thing is

true with respect to the cost of services provided. The provision in this bill for the payment of reasonable cost of services is intended to meet the actual cost. "Actual." That is not economic or fanciful or anything else. We put it in there so they could not bring in the various things you are talking about now. How do you get around this?

*Hearings, supra* at 69.

> The CHAIRMAN. But did you have the impression anywhere that the congressional intent was that we should have allowed imputed interest on capital?

> MR. MYERS. No. In making the cost estimates, I had no thought that that would be done.

> The CHAIRMAN. What we are talking about is an item neither you nor we had any idea of allowing. I never had an idea we were going to allow imputed interest. Nobody, so far as I know, in your Department—did your Department have any idea that we were going to allow imputed interest?

> MR. BALL. No, Mr. Chairman. And I think one of the main reasons that the staff resisted the tendency of the Health Insurance Benefits Advisory Council to move to his position was not necessarily on the merits of the economic argument, but the fact that it had not been considered, and that it therefore ought to be postponed. That was the thought there.

*Hearings, supra* at 49–50.

It is clear that the 2% allowance included some fraction for a return on equity capital.

> MR. BALL.... We believe this 2-percent allowance is necessary to carry out this objective. Difficulty in measurement, lack of adequate data and other considerations have precluded specific recognition of various elements which are germane to costs of services for beneficiaries.

> For example, as indicated earlier, the other principles do not provide for specific recognition of a return on equity capital and it is recognized that historical depreciation may not be fully adequate for a determination of costs. Moreover,

although the methods to be utilized by providers for allocating the cost to be attributable to beneficiaries are the best available, there is a lack of precision in the methods which may well result in understating the cost of rendering services to older people—for example, the likelihood of somewhat greater cost of rendering nursing and related services to older people.

It is the established practice of a significant number of large third party purchasers to include in payment for cost of services a factor in the form of an allowance to cover various elements not specifically recognized in the formula or not precisely measured. The 2-percent allowance provided for in our principles does the same thing. It is not a bonus but a part of basic cost.

The allowance is limited to an amount which might be justified as a minimum return for the use of equity capital, as discussed earlier. It is limited to an amount which, as a percentage of the provider's net investment, does not exceed the rate of return on Government obligations currently being acquired by the social security trust funds. In the determination of the amount of the provider's net investment, for purposes of applying this limitation, the cost of assets financed by Hill-Burton or other Federal funds will be excluded. The exclusion will be on the basis of the share of the cost financed by Federal funds after the adjustment for depreciation.

The 2-percent allowance applies alike to profit and nonprofit organizations. Thus the principles avoid the anomalous result that would arise from reimbursing a profitmaking organization more than a nonprofit organization for rendering exactly the same service—solely by reason of allowing return on investment in one case but not the other.

*Hearings, supra* at 56. It is obvious that Mr. Ball, the then Commissioner of Social Security, thought that Medicare should reimburse hospitals for return on equity, that the 2% allowance included some fraction for this item, and that there should be no distinction between profit and non-profit hospitals with respect to return on equity. It is not, however, obvious that Congress agreed with Mr. Ball or that it intended that all hospitals receive return on equity from Medicare. The discussion at the Hearings show that return on equity was not considered by Congress when it enacted the statute and that return on equity for non-profit hospitals was not considered in the cost estimates given to Congress.

MR. MYERS. Yes, Mr. Chairman.

The CHAIRMAN. You are the one who informed us what this would cost, and you had a breakdown of these costs, so you could give us your estimate of what you thought it would cost to do all of this. You advised us at every step of the way, including the conference between the Senate and House, is that correct?

MR. MYERS. That is correct, Mr. Chairman.

The CHAIRMAN. Now, I would like to ask you what new items or what items are in these cost figures that you didn't have in your estimates when you gave them to the committee and before the conference last year?

MR. MYERS. Mr. Chairman there are three items that result in added cost. One of them is the 2 percent allowance that Commissioner Ball has mentioned. The second is the advance of funds to the hospitals before the normal course of payment. And the third one is the accelerated depreciation method—since in my previous estimates I had always assumed that depreciation would be handled more or less as has been done in the past by hospitals, on a straightline method or some other method of somewhat lesser cost.

And together these three differences in the assumptions—the three differences in the factors and in the assumptions that I made would result, as Mr. Ball has said, in a 2½ percent relative increase, or an increase as a percentage of taxable payroll of a little more than .03 percent.

The CHAIRMAN. Now, in your cost estimates, what was your position, and

what was your estimate with regard to the question of a fair return on net equity of proprietary institutions?

MR. MYERS. In my estimates I had assumed there would be such a factor present-although whether it would or would not have been present would not have had any significant effect on the cost estimates for the hospital benefits, because only about 5 percent of the total hospitalization occurs in proprietary hospitals.

The CHAIRMAN. So when you get down to it, the cost of this is relatively insignificant. But may I just say this is as a practical matter-to me it is just unbelievable to think that anyone would propose to use proprietary institutions without allowing a return on equity capital. It seems inconceivable to me-to anyone who believes in the free enterprise system-that if you have one fellow competing with someone else who paid not a nickel for his plant and equipment, had it all given to him by the Government, or had it donated, where the people even made money by donating it-we would suggest that they not allow him something on that.

*Hearings, supra* at 58.

Another point that becomes obvious in reading the Hearings transcript is that, while those proposing the 2% allowance felt that return on equity was a cost incurred by both profit and non-profit hospitals, they were not willing to include it expressly under the reasonable cost formula but chose to allow it as a fraction of the 2% allowance. *See Hearings, supra* at 49–50 (quoted *supra*).

There is also evidence in the Hearings transcript that the Senators interpreted actual costs as specifically excluding any funds for improvements or new construction.

SENATOR ANDERSON. Just one more quotation from page 37 of the report which I think should have some importance to you. I really believe when a committee goes to the extent of preparing a report, and filing it, and telling the Congress and the people that this is what they mean, it is wrong to try to reinterpret it some other way.

In paying reasonable cost, it should be the policy of the insurance program to so reimburse a hospital or other provider that an accounting may be made at the end of each cost period for costs actually incurred.

Not beneficiarily incurred, or anything else-"actually incurred." And if you don't pay interest on a debt, that is not a cost that is actually incurred.

MR. COHEN. May I also refer you, Senator, to page 32 in the House committee report which says:

In the determination of reasonable costs of services, consideration shall be given to all necessary and proper expenses incurred in rendering services including normal stand-by costs.

I think that—

SENATOR ANDERSON. What are standby costs? The costs of empty beds? That is a wholly different situation. This whole matter, I think-I want to suggest very respectfully, Secretary Cohen-raises a question about the philosophy of aiding hospitals such as under the Hill-Burton program by law which the Congress enacts, and in which we can put funding and planning requirements, or whether you do it by giving them a share of this money and letting them use it as they see fit. We find hospital after hospital that says, "This hospital has a new device, and we want the same thing."

Therefore there should be planning. I fully subscribed to that. I wish it were possible to say that if you are going to give them depreciation, you can require that they fund it and plan it to take care of future expenditures carefully.

I think Mr. Ball is right in saying it cannot be enforced properly. But it ought to be.

MR. BALL. Mr. Chairman, I have no doubt but what-at each opportunity the hospital field and the nursing-home field will press again for major improvements in their reimbursement formula.

SENATOR ANDERSON. As a means of getting their money for new buildings through this routine instead of Hill-Burton financing or money of that nature. That is the real danger, I think.

MR. BALL. Well, I don't believe really, Senator, there is enough in this 2-percent factor to be a very significant addition to capital expenditures.

*Hearings, supra* at 70, 71.

The 2% allowance went into effect in the fall of 1966. In October of that year Congress amended the Medicare Act to include § 1395x(v)(1)(B). This section specifically directs the Secretary to include a provision in the regulations for return on equity to proprietary nursing homes and expressly provided that this allowance was "in lieu of other allowances to the extent that they reflect similar items." A return on equity is also paid to proprietary providers of hospital services based upon a specific directive in the Legislative Conference Report that accompanies § 1395x(v)(1)(B): "The conferees expect that the Secretary of Health, Education and Welfare will apply similar or comparable principles in determining reasonable costs for reimbursement for proprietary hospitals for services furnished by them." H.R.Rep. No. 2317, 89th Cong., 2d Sess. 166, *reprinted in* 1966 U.S.Code Cong. & Ad.News 3676, 3692–93. Based on the amendment to the act, the Secretary decreased the 2% allowance for proprietary hospitals to 1–1½% but left the 2% allowance for non-profit hospitals.

When the act was amended Congressman Byrnes stated, "the amount that will be paid to the individual nursing home or facility–shall be, and I quote, the reasonable cost of furnishing such care. In other words, as the law now stands, fundamentally all the Social Security Administration can pay are the costs, with no allowance for profits or a return on the invested capital" 112 Cong.Rec. 28220 (1966). Again this is evidence that Congress believed that return on equity was not included as an allowable cost under Medicare and that a specific provision was needed to reimburse proprietary hospitals for this cost. Further, the section expressly instructs the Secretary to reimburse proprietary providers and neglects to mention non-profit providers and it is not unreasonable to infer that Congress did not intend for non-profit providers to receive return on equity since Congress believed that return on equity was not otherwise an allowable cost.

The plaintiffs argue that Congress allowed the Secretary to pay the 2% figure to non-profit hospitals until the summer of 1969, when it was deleted for budgetary reasons, and that this evidences congressional acceptance of paying return on equity to non-profit institutions as a part of costs. The plaintiffs also argue that the Secretary cannot now argue that he is precluded by Congress from paying return on equity to non-profit hospitals when he in fact paid them the 2% allowance for three years. The plaintiffs have a point. However, it is clear that more than a return on equity was involved in the 2% allowance. In addition to the Secretary's opinion then that return on equity might be an actual cost, there was the problem of the ability to adequately measure costs, the concern that Medicare patients may require more nursing care, and the concern that the program would need to attract hospitals to participate. These additional concerns may well have played a part in congressional acceptance. There was also the need to get the program underway. The Hearings took place in May and the program was to begin in July.

It is the Secretary's position now that he incorrectly paid return on equity to non-profit hospitals during the period 1966 to 1969 as part of the 2% allowance. From the discussions quoted above, the Secretary's interpretation of congressional direction is entirely reasonable and certainly not arbitrary and capricious.

There is also the argument that Congress has ratified the Secretary's action in removing the 2% allowance and hence reimbursement for return on equity to non-profit hospitals by failing to take any action to amend either § 1395x(v)(1)(A) or § 1395x(v)(1)(B) in the twelve years since

1142

1969. The court in *Hospital Authority of Floyd County, Georgia v. Schweiker,* 522 F.Supp. 569 (N.D.Ga.1981), addressed the question of congressional ratification of the 1969 actions taken by the Secretary and concluded that its failure to amend section § 1395x(v)(1)(B) vindicated the Secretary's decision to provide the allowance only to proprietary facilities. Congress amended the Medicare Act in 1972 and left the sections in question intact. In a report issued to the Senate Finance Committee in February, 1970, a full eight months after the 2% allowance had been discontinued, the Committee staff specifically addressed the 2% figure:

> The 2-percent bonus on top of accounted-for costs was added to Medicare reimbursement by HEW regulation in 1966; it was subsequently removed by HEW regulation in 1969. The bonus had been rationalized as a "growth" factor by hospitals and by Social Security as an allowance for costs actually incurred but unidentifiable due to problems in cost-finding during the initial stages of Medicare. Either way, the bonus was not justifiable, in our opinion.
>
> Possibly, the Federal Government, along with all purchasers of hospital care should help meet certain identified and approved capital needs of non-profit hospitals where such needs cannot be met through depreciation allowances, contributions, regular borrowings, existing Federal Programs, etc. But any significant capital improvement financed in whole or part by the Federal Government should be contingent upon approval of an appropriate community or State planning body broadly representative of all of the various types of health care and services.

Medicare and Medicaid—Problems, Issues and Alternatives, a Report of the Staff, Committee on Finance, United States Senate, 91st Sess. (Feb. 9, 1970) at 48. The importance of the report is that it shows that Congress was aware of the actions of the Secretary in 1969 and at least the staff members of the Finance Committee approved that action. Presumably, being aware of what the Secretary had done and

its possible impact upon non-profit hospitals, Congress would have amended the act to provide return on equity to charitable hospitals if it had not approved the actions of the Secretary.

In 1978 Congress added a section to the act dealing with end stage renal disease, 42 U.S.C. § 1395rr. Subsection (b)(2)(C) again provides for return on equity for proprietary providers but not for charitable providers. Suffice it to say that there is substantial evidence of ratification of the Secretary's action.

The court finds that the Secretary's interpretation of "reasonable costs" in section 1395x(v)(1)(A) as excluding return on equity is consistent with congressional intent and is not arbitrary and capricious nor an abuse of discretion. Non-profit hospitals need return on equity to finance replacement of equipment and facilities and to fund new capital expenditures. Proprietary hospitals need return on equity both as profit to investors and to finance replacement and fund new expenditures. It is clear that Congress never intended to finance capital expenditures for either proprietary or non-profit hospitals through the Medicare Act. All discussions relating to return on equity for proprietary hospitals are phrased as profit or return on investment for investors, there is nothing about financing for new capital expenditures or for replacement of existing facilities or equipment. The return on equity given to proprietary hospitals is intended to represent profit. The plaintiffs attempted to show that return on equity is not profit and that it is needed by non-profit hospitals as well as proprietary hospitals. The court accepts the argument that return on equity is actually not a profit for non-profit hospitals, but believes that Congress intended to reimburse profit, not return on equity as defined by the plaintiffs.

Replacement of existing assets and facilities and expansion of services and technology is an extremely important concern and certainly an obligation but it is not an obligation that has been undertaken by Congress in the Medicare Act.

Because return on equity is not a "reasonable cost" allowable under § 1395x(v)(1)(A), shifting this cost to other patients is not a violation under that section.

### Equal Protection of the Laws

 Lastly, the plaintiff hospitals argue that, if the court determines that Congress intended that non-profit hospitals be denied return on equity, the statute is unconstitutional as a violation of equal protection. First of all, there can be a violation of equal protection only if the statutory scheme or regulations are irrational. *Dandridge v. Williams,* 397 U.S. 471, 495–96, 90 S.Ct. 1153, 1166–67, 25 L.Ed.2d 491 (1970). As discussed previously, Congress drew a distinction between providing a return for investors and providing funds to enable hospitals to finance new capital expenditures. At the time the Medicare Act was passed, non-profit hospitals had other advantages over proprietary hospitals. They are not taxed, they now can obtain financing through tax free bonds, previously they were able to obtain funds for new construction through Hill-Burton grants, and Medicare allows non-profit hospitals to obtain reimbursement for some expenses not recognized for proprietary institutions, *see Amer. Med. Int'l., Inc. v. Sec. of H.E.W.,* 466 F.Supp. 605 (D.D.C.1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981). In short, profit and non-profit hospitals are not the same. Medicare provides benefits for one where it does not for the other. Granted, a number of the benefits previously given to non-profit institutions have later been removed because of budgetary problems. However, this court is not prepared to say that circumstances have changed to the point that distinguishing between proprietary and non-profit hospitals is no longer rational. Especially in light of the conclusion that Medicare was never intended to fund capital expenditures.

This court is sympathetic to the plight of non-profit hospitals and deeply concerned, as we all must be, that the hospitals in this country be maintained and that they be able to keep up with technological advances in the field of medicine. The testimony presented in this case paints a very bleak future for non-profit hospitals and this future affects all of us. The plaintiffs have raised momentous questions of socio-economic and political significance. A return on equity may be economically necessary to permit non-profit hospitals to continue. Nevertheless, Congress may choose to fund all or only a part of the Medicare Program. If Congress has devised a scheme for reimbursement that may ultimately cause a significant number of non-profit hospitals to fail, this court should not impose its sociological views because it thinks that the decision may be unwise.

The evidence in this case indicates that perhaps as many as one-half of the total number of non-profit hospitals will be unable to borrow by 1993, making it impossible for them to replace equipment and facilities and making failure inevitable. Because of their inability to obtain reimbursement for return on equity for Medicare patients, the hospitals have had to increase charges to non-Medicare patients with the result that non-Medicare patients must subsidize the cost of return on equity for Medicare patients. Congress clearly has the power to make these choices. This court cannot solve these problems by interpreting the Medicare Act to provide a return on equity capital when the evidence shows that Congress and the Secretary, insofar as this statute is concerned, have no interest in assuring that hospitals can obtain financing.

Therefore, the plaintiffs' request for injunctive relief is denied and the plaintiffs' cause of action is dismissed.

So ordered.