## HOSPITAL AUTHORITY OF FLOYD COUNTY, GEORGIA, Plaintiff-Appellant,

v.

## Margaret M. HECKLER, Secretary, U.S. Department of Health & Human Services, Defendant-Appellee.

No. 81–7835.

United States Court of Appeals, Eleventh Circuit.

June 13, 1983.

---

Smith, Shaw, Maddox, Davidson & Graham, James D. Maddox, Jackson B. Harris, Rome, Ga., for plaintiff-appellant.

Jere W. Morehead, Asst. U.S. Atty., Atlanta, Ga., Jeanne Schulte Scott, Atty., Washington, D.C., for defendant-appellee.

Before RONEY and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

Appellant, a public nonprofit hospital providing medicare, sought a return on its equity capital as a "reasonable cost" reimbursable under the Medicare Act, 42 U.S.C.A. sections 1395 *et seq.* (1974). After the Health Care Financing Administration declined to review the Provider Reimbursement Board's denial of appellant's claim, appellant brought an action in the district court which then granted appellee's motion for summary judgment, holding, (1) the denial by the Department of Health and Human Services since 1969 of reimbursement to nonprofit hospitals for return on equity capital was consistent with the Medicare statutes, and (2) the denial was not inconsistent with nonprofit hospitals' rights of equal protection. We affirm the district court's carefully reasoned decision. 522 F.Supp. 569 (N.D.Ga.1981).

Appellant challenges the Secretary's regulation, 42 C.F.R. sec. 405.429, providing for reimbursement to only proprietary hospitals for return on their equity capital. This regulation was formulated in light of the 1966 Amendments to the Medicare Act, P.L. 89–713, 42 U.S.C.A. sec. 1395x(v)(1)(B), providing in part as follows:

> ... Regulations [defining reasonable cost] in the case of extended care services provided by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital ...

Appellant argues, as it did to the district court, that the statute's legislative history indicates that Congress intended that both proprietary and nonprofit hospitals would receive an allowance for return on equity. In making this argument, appellant points to a special additional allowance—existing in medicare's early days—of two percent of total specified costs. The Secretary of Health, Education and Welfare proposed

this special allowance in June 1966, the month before the Medicare Act became effective. The Secretary apparently intended that the two percent would compensate both proprietary and nonprofit hospitals for otherwise unspecified costs, one of which was return on equity capital. The Secretary effected his two-percent proposal in fall 1966. Thus, it was contemporaneous with the above-cited amendment creating 42 U.S.C. sec. 1395x(v)(1)(B), which Congress approved October 19, 1966. Appellant finds support for its argument in the contemporaneity of the origins of the allowance and the amendment. Indeed, in the wake of the amendment's approval, the Secretary decreased the two-percent allowance for proprietary hospitals to one and one-half percent, but left the two-percent allowance for nonprofit hospitals intact. The Secretary paid the two-percent allowance to the nonprofit hospitals from fall 1966 through summer 1969, when he stopped in part for budgetary reasons.

Appellant argues that the contemporaneity of the origins of the allowance and the amendment, along with the three-year survival of the allowance after the amendment's enactment, demonstrate that Congress did not intend the amendment to eliminate reimbursement to nonprofits for return on equity capital. However, a close examination of the amendment's legislative history indicates that Congress did so intend.

First, the two-percent allowance covered more than a return on capital equity. During senate hearings on the question of reimbursement guidelines, Mr. Robert Ball, Commissioner of Social Security, testified in part as follows:

> We believe this 2-percent allowance is necessary to carry out [the] objective [of paying "the full cost for medicare patients so that none of the cost of services to them will fall on nonmedicare patients"]. Difficulty in measurement, lack of adequate data and other considerations have precluded specific recognition of various elements which are germane to costs of services for beneficiaries.

> For example, as indicated earlier, the other principles do not provide for specific recognition of a return on equity capital and it is recognized that historical depreciation may not be fully adequate for a determination of costs. Moreover, although the methods to be utilized by providers for allocating the cost to be attributable to beneficiaries are the best available, there is a lack of precision in the methods which may well result in understating the cost of rendering services to older people—for example, the likelihood of somewhat greater cost of rendering nursing and related services to older people.

> It is the established practice of a significant number of large third party purchasers to include in payment for cost of services a factor in the form of an allowance to cover various elements not specifically recognized in the formula or not precisely measured. . . .

*Reimbursement Guidelines for Medicare: Hearing before the Senate Comm. on Finance,* 89th Cong., 2nd Sess. 56 (1966). Thus, in addition to covering return on equity, the Secretary sought, through the two-percent allowance, to cover imprecision in cost measurement and costs above the norm due to the age of medicare patients. The Hearing occurred late in May 1966 and the medicare program was to begin only about a month later. The administrators were anxious to attract hospitals to the program and wished to insure the adequacy of the financial incentive. *See Saline Community Hospital Ass'n v. Schweiker,* 554 F.Supp. 1133 (E.D.Mich.1983). The two-percent allowance was tolerated until the program was soundly underway.

The district court was correct in finding that the exchanges between senators and administrators at the Hearing "make it quite unequivocal that the Senate Committee members believed that a return on equity capital was not, and should not, be provided [by the Medicare Act]," 522 F.Supp. at 572, although it is also clear that the

administrators believed a return should be provided.[1] These exchanges took place in May; the amendment was enacted only a few months later in October. At the time

1. At the beginning of the Hearing, Senator Long, the Chairman, in outlining the topic to be discussed, stated:

> Can the reasonable cost include a return on investment for proprietary institutions without a similar payment to the nonprofit facilities. And that is a fair question to be raised. It seems to me that it was intended that there should be a return on investment to proprietary institutions—and that there is no similar requirement that they be made to public or nonprofit groups.

Hearings, at 43.

At the Hearings, various senators challenged the two-percent allowance as including reimbursement for items that Congress never discussed or approved:

> The CHAIRMAN [SENATOR LONG]. But did you have the impression anywhere that the congressional intent was that we should have allowed imputed interest on capital?
> MR. MYERS. No. In making the cost estimates, I had no thought that that would be done.
> The CHAIRMAN. What we are talking about is an item neither you nor we had any idea of allowing. I never had an idea we were going to allow imputed interest. Nobody, so far as I know, in your Department— did your Department have any idea that we were going to allow imputed interest?
> MR. BALL. No, Mr. Chairman. And I think one of the main reasons that the staff resisted the tendency of the Health Insurance Benefits Advisory Council to move to his position was not necessarily on the merits of the economic argument, but the fact that it had not been considered, and that it therefore ought to be postponed. That was the thought there.

Hearings, at 49–50.

> SENATOR WILLIAMS. In computing the costs incurred, how can you get an estimate for interest which is not owed, not paid? How can you get an allowance for an interest charge not owed and not paid, if you are going to stick to the formula of actual costs incurred?
> MR. BALL. We did not accede to this argument for allowing an interest return on equity capital.

Hearings, 49–51.

> MR. COHEN [Under Secretary]. I think the point, Senator, is that Congress did, in setting up the concept of reasonable cost, intend for us to reflect what the economic cost of hospital care was. And as Mr. Gordon says, if you were going to pay for the interest on borrowing the money it seems to us to be reasonable to try to reflect in the cost what is actually the incurred cost of a hospital when it has to operate. So while it was not discussed in those specific terms, I think it is absolutely consistent with the intent of Congress that what the program should pay should really reflect what the economic cost is for a hospital in providing these services.
> SENATOR ANDERSON. I just could not disagree with you more. We discussed this over and over and over again, and rejected that in the committee. I just call your attention to the committee report, page 33:

> > The cost of hospital services varies widely from one hospital to another, and the variations reflect differences in quality and cost. The same thing is true with respect to the cost of services provided. The provision in this bill for the payment of reasonable cost of services is intended to meet the actual cost.

> "Actual." This is not economic or fanciful or anything else. We put it in there so they could not bring in the various things you are talking about now. How do you get around this?
> MR. COHEN. Well I think this is the actual cost. I think when you are talking about economic costs—

> \* \* \* \* \* \*

> SENATOR ANDERSON. Just one more question from page 37 of the report which I think should have some importance to you. I really believe when a committee goes to the extent of preparing a report, and filing it, and telling the Congress and the people that this is what they mean, it is wrong to try to reinterpret it some other way.

> > In paying reasonable cost, it should be the policy of the insurance program to so reimburse a hospital or other provider that an accounting may be made at the end of each cost period for costs actually incurred.

> Not beneficiarily incurred, or anything else —"actually incurred." And if you don't pay interest on a debt, that is not a cost that it actually incurred.

Hearings, at 69–70.

> The CHAIRMAN. You are the one who informed us what this would cost, and you had a breakdown of these costs, so you could give us your estimate of what you thought it would cost to do all of this. You advised us at every step of the way, including the conference between the Senate and House, is that correct?
> MR. MYERS. That is correct, Mr. Chairman.
> The CHAIRMAN. Now, I would like to ask you what new items or what items are in these cost figures that you didn't have in your estimates when you gave them to the committee and before the conference last year?
> MR. MYERS. Mr. Chairman there are three items that result in added cost. One of them is the 2 percent allowance that Commissioner Ball has mentioned . . . .

Hearings, at 58.

of the amendment's enactment, Congressman Byrnes stated,

> The amount that will be paid to the individual nursing home or facility . . . shall be, and I quote, "the reasonable cost" of furnishing such care. In other words, as the law now stands, fundamentally all the Social Security Administration can pay are the costs, with no allowance for profits or a return on equity.[2]

112 Cong.Rec. 28220 (1966). This is more evidence that Congress believed that "return on equity was not an allowable cost under medicare and that a specific provision was needed to reimburse proprietary hospitals for this cost." *Saline Community Hosp.*, 554 F.Supp. at 1141.

The district court found further evidence of congressional intent in the amendment itself. The amendment expressly instructs the Secretary to reimburse proprietary providers with a reasonable return on equity capital and fails altogether to mention nonprofit providers. The district court also reasoned that Congress's failure to overrule the Secretary's 1969 cancellation of the two-percent allowance ratifies that cancellation. Indeed, Congress amended the Medicare Act in 1972 and left the provisions in question intact. In a report issued by the Senate Finance Committee a full eight months after the two-percent allowance had been discontinued, the committee staff stated:

> The 2-percent bonus on top of accounted-for costs was added to Medicare reimbursement by HEW regulation in 1966; it was subsequently removed by HEW regulation in 1969. The bonus had been rationalized as a "growth" factor by hospitals and by Social Security as an allowance for costs actually incurred but unidentifiable due to problems in cost-finding during the initial stages of Medicare. Either way, the bonus was not justifiable, in our opinion.

*Medicare and Medicaid—Problems, Issues and Alternatives,* Staff of Senate Comm. on Finance, 91st Cong., 1st Sess. (Comm. Print 1970).

Thus, for the reasons the district court amply set forth, we conclude that the denial by the Department of Health and Human Services to nonprofit hospitals of an allowance for return on equity capital is consistent with the Medicare statutes.

■ Appellant asserts that the denial was not consistent with its equal protection rights. The district court was correct in concluding that the statutory scheme and the regulations have a rational basis. As the district court in *Saline Community Hospital Association v. Schweiker* noted:

> Congress drew a distinction between providing a return for investors and providing funds to enable hospitals to finance new capital expenditures. At the time the Medicare Act was passed, non-profit hospitals had other advantages over proprietary hospitals. They are not taxed, they now can obtain financing through tax free bonds, previously they were able to obtain funds for new construction through Hill-Burton grants, and Medicare allows non-profit hospitals to obtain reimbursement for some expenses not recognized for proprietary institutions . . .

554 F.Supp. at 1143.

AFFIRMED.

---

**2.** Congressman Byrnes said further:

Mr. Speaker, I believe you will find that after the adoption of this conference report the proprietary nursing home will be paid on one basis and the nonprofit will be paid on a different basis. There will be legitimate criticism from nonprofit institutions, because here we fix in the statute, discrimination between the manner in which we treat the two types of organizations.
112 Cong.Rec. 28221 (1966).