**ST. FRANCIS HOSPITAL CENTER, et al., Plaintiffs-Appellants,**

v.

**Margaret HECKLER,\* Secretary, Department of Health and Human Services & Provider Reimbursement Review Board, Thomas Tierney, Chairman, Defendants-Appellees.**

No. 82–2458.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1983.

Decided Aug. 12, 1983.

\* The name of the present Secretary is ordered substituted for the name of her predecessor, Richard S. Schweiker, according to Rule 43(c) of the Federal Rules of Appellate Procedure.

Geoffrey Segar, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for plaintiffs-appellants.

Jeanne Schulte Scott, Dept. of Health & Human Services, Washington, D.C., for defendants-appellees.

Before BAUER, WOOD and ESCHBACH, Circuit Judges.

PER CURIAM.

Sixty-eight nonproprietary hospitals ("the Hospitals") appeal from the district court's decision denying them reimbursement under the Medicare Act, 42 U.S.C. §§ 1395 through 1395pp, for a return on equity capital and for certain bad debt and charity expenses. 544 F.Supp. 1167 (S.D.Ind.1982). We affirm the decision of the district court and adopt those portions of the court's excellent opinion reproduced as an appendix to our opinion. We have deleted certain portions of the opinion, primarily those dealing with a separate suit that was not appealed and those addressing issues not raised on appeal. We add the supplemental sections immediately below to address arguments raised on appeal that are not specifically answered by the district court's opinion.

### Standard of Review

In their attempt to secure a return on equity capital, the Hospitals were successful in convincing the Provider Reimbursement Review Board ("PRRB") that such a return was a "reasonable cost" for nonproprietary facilities. The Secretary, through the Deputy Administrator of the Health Care Financing Administrator, reversed this ruling and held that the Hospitals could not recover a return on equity. On appeal, the Hospitals contend that the district court erred in giving deference to the Secretary's interpretation of the statute and in failing to give adequate weight to the decision of the PRRB.

The standard of review for reimbursement decisions rendered under 42 U.S.C. § 1395oo is found in "the applicable provisions under chapter 7 of Title 5." 42 U.S.C. § 1395oo(f). Thus the standards of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, govern. Section 706 provides that "the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions. . . ." The court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." *Id.*

In the instant case, we do not have a challenge to any findings of fact—the facts are essentially undisputed. Neither do we have a dispute over the interpretation of an agency regulation. The present regulatory scheme denying return on equity for nonproprietary hospitals has been firmly and unambiguously in place since 1969. The challenge the Hospitals raise is that the regulatory scheme is in violation of the Medicare statute and the Constitution.

We note at the outset that to the extent the Hospitals challenge the constitutionality of the statute or the regulatory scheme, their non-deference argument is unnecessary. Deference to administrative expertise does not extend to judging the constitutionality of a statute or regulatory scheme. As far as construing the Medicare statute, a court should give deference to the interpretation of the agency charged with administration of the statute. *See Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971). Congress has charged the Secretary of Health and Human Services ("HHS") with administration of the Medicare program. 42 U.S.C. § 1395kk. Nevertheless, deference to the Secretary must yield to the clear meaning of the statute as revealed by its language, purpose and history. *See Southeastern Community College v. Davis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979).

The Hospitals suggest that these well established principles are altered in this case because the Secretary reversed the PRRB on the issue of return on equity capital. For support they point to *St. John's Hickey Memorial Hospital v. Califano,* 599 F.2d 803 (7th Cir.1979), in which we declined to defer to the Secretary's determination that the costs of a certain educational program were not reimbursible under the Medicare regulations. In particular, the Hospitals point to the following passage:

> This special provision for judicial review [42 U.S.C. § 1395oo(f)] is not surprising in light of the statutory scheme. Here the plaintiff is not the beneficiary of the government program, but a necessary participant in carrying out the program. The Secretary is obligated by statute to reimburse all reasonable costs of such providers. It would be inappropriate to allow his subordinates to be the final arbiter of what is reasonable, particularly when they have overruled the decision of the Provider Reimbursement Review Board which was set up to mediate disputes between providers and intermediaries acting for the agency.

*Id.* at 813 n. 18.

This does not support the Hospitals' argument that the district court should have deferred to the PRRB's decision. Final responsibility for rendering a decision lies in the agency itself, not with subordinate hearing officers, and it is this decision that the district court reviewed. *See American Medical International, Inc. v. Secretary of Health, Education and Welfare,* 466 F.Supp. 605, 611 (D.D.C.1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981). The decision of the PRRB can be considered no more expert than the decision of the Secretary.

Under 42 U.S.C.A. § 1395oo(f) and 42 C.F.R. § 405.1875 (1979), the Secretary, on her own motion and at her discretion, may review a decision of the PRRB and on review has all the powers she would have if making the initial determination. 5 U.S.C.A. § 557(b). Thus the decision of the PRRB carries no more weight on review by the Secretary than any other interim decision made along the way in an agency where the ultimate decision of the agency is controlling. The argument that the court should recognize the expertise of the members of the PRRB must be met with the assumption that those persons within the agency who assisted the Secretary in a contrary decision must be regarded as being equally expert. *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir.1980).

■ The Hospitals argue that the prior contrary decision of the PRRB lessens the degree of deference due the *Secretary's* decision. We note first that the passage from *St. John's,* quoted above, is primarily a comment on the propriety of judicial review, and does not directly address the question of whether deference is lessened when the Secretary has reversed the PRRB. We did state in that case that the degree of deference accorded the Secretary in implementing regulations varies with the circumstances of each case. *St. John's Hickey Memorial Hospital v. Califano, supra,* 599 F.2d at 812. In that case, we found *extreme* deference inappropriate when the court merely disagreed with an unofficial interpretation of a regulation. *Id.* In contrast, in the instant case, we are faced with the Secretary's judgment that her regulatory scheme denying a return on equity capital to nonproprietary hospitals, in place since 1969, is consistent with the statute she is charged with administering. In these circumstances, we believe the district court's deference to the Secretary's decision was appropriate.

*Supplement—Is a Return on Equity Capital a Reasonable Cost for Nonproprietary Providers Under 42 U.S.C. § 1395x(v)(1)(A)?*

While we have adopted the district court's analysis on this point and the point following, we add these supplemental sections to answer arguments raised on appeal and not specifically addressed by the district court.

All providers are entitled to reimbursement of the "reasonable cost" of the services provided. 42 U.S.C. § 1395f(b). Reasonable costs are defined generally in 42 U.S.C. § 1395x(v)(1)(A), with authorization

for the Secretary to prescribe regulations further defining reasonable costs. 42 U.S.C. § 1395x(v)(1)(B), added in 1966, directs the Secretary to include in the regulations a provision for return on equity capital for *extended care services* provided by *proprietary* facilities. The Hospitals contend that the services of proprietary hospitals do not fit the literal language of § 1395x(v)(1)(B), and therefore their return on capital must come under the general provisions for reasonable costs, § 1395x(v)(1)(A). If a return on equity capital is a reasonable cost under this section for proprietary hospitals, the appellants argue that it is also a reasonable cost for nonproprietary hospitals.

The reasons Congress had for singling out proprietary facilities providing *extended care service* (*i.e.,* skilled nursing facilities) are not clear. The legislative history is scant. There is some indication, however, that Congress intended a return on equity capital to be extended to *all* proprietary providers. The Managers on the Part of the House submitted a statement to explain the recommended action of the committee of conference considering the proposed 1966 amendment. The committee recommended the amendment, which is now codified at § 1395x(v)(1)(B), the house managers explaining:

> The conferees expect that the Secretary of Health, Education, and Welfare will apply similar or comparable principles in determining reasonable costs for reimbursement of proprietary hospitals for services furnished by them.

H.R.Rept. No. 2317, 89th Cong., 2d Sess., 166, *reprinted in* 1966 U.S.Code Cong. & Ad.News 3676, 3692–93.

■ The legislative enactments at issue here are not a model of clarity. However, they do not alter our conclusion that Congress did not intend a return on equity capital for nonproprietary providers to be reimbursable as a "reasonable cost" under § 1395x(v)(1)(A). Any ambiguity we find goes to the issue of whether *proprietary hospitals* are entitled to such a return under either § 1395x(v)(1)(A) or (B), an issue we need not decide at this point. We agree

with the Secretary, the district court, and the other courts that have faced the issue presently before us—Congress did not intend nonproprietary facilities to collect a return on equity capital as part of the "reasonable cost" of providing services.

*Supplement—Does the Statutory or Regulatory Scheme Violate the Just Compensation Provision of the Fifth Amendment?*

■ The Hospitals argue that those cases in which the Supreme Court held government-prescribed rates to be confiscatory, *e.g. Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), are directly analogous to the instant case. They correctly point out that the government cannot prescribe rates so low that the result is a taking of property without just compensation, *see id.* at 526, 18 S.Ct. at 426, and that the government cannot defend setting low rates in one market segment by arguing that the regulated enterprise can set higher rates for another segment and thus turn a net profit, *see id.* at 541, 18 S.Ct. at 431.

The Hospitals' argument might well prove persuasive if participation in the Medicare program were mandatory. However, Medicare is a federally sponsored insurance program for the aged and disabled, 42 U.S.C. § 1395c, and provider participation is voluntary, 42 U.S.C. § 1395cc. Providers who opt not to participate are free to serve persons not covered by Medicare and those potential Medicare recipients who are willing to forego Medicare benefits for the services provided. As a practical matter, perhaps few of those persons eligible for Medicare would choose a non-participating hospital, but the fact that practicalities may in some cases dictate participation does not make participation involuntary. Even those hospitals that have an obligation to participate in the Medicare program because of their receipt of funds under the Hill-Burton Act, 42 U.S.C. § 291; 42 C.F.R. § 124, made a voluntary choice to accept both the obligations and the benefits of Hill-Burton funding. *Cf. Johnson County Memorial Hospital v. Schweiker,* 698 F.2d 1347, 1350 (7th Cir.1983) (Medicare does not reimburse for charity costs accrued under

the Hill-Burton Act because "the government has already paid through contractual agreements for [that] indigent care"). We therefore find *Smyth v. Ames, supra,* and its progeny to be inapposite, and conclude, with the district court, that there has been no violation of the Fifth Amendment just compensation provision. *Cf. Pharmacist Political Action Committee v. Harris,* 502 F.Supp. 1235, 1242–43 (D.Md.1980) (Maximum Allowable Cost regulations for prescription drugs dispensed under Medicare and Medicaid programs did not constitute taking of property, in part because participation in programs is voluntary).

### Conclusion

The Hospitals and the amici curiae, the American Hospital Association and the Catholic Health Association of the United States, have presented strong arguments in favor of allowing nonproprietary hospitals a return on equity capital under Medicare. Those arguments, however, are made to the wrong forum. This court cannot require what may seem wise, but only what is required by the Medicare statute and the Constitution. Having found that neither the statute, due process or equal protection requires a return on equity capital for nonproprietary hospitals, we affirm the district court's judgment and adopt those portions of the district court's opinion reproduced below.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

 St. Francis Hospital Center, )
et al., )
)
Plaintiffs, )
)
v. ) No. IP 80–89–C
) No. IP 80–206–C
Richard S. Schweiker, Secretary ) No. IP 80–272–C
Department of Health and ) No. IP 80–500–C
Human Services, )
Provider Reimbursement Review )
Board, )
Thomas Tierney, Chairman, )
)
Defendants. )

### MEMORANDUM OF DECISION

\* \* \*

The facts and legal issues presented by these cases are complex and will be dealt with in greater detail in the body of this memorandum. In brief, these suits present challenges to Medicare reimbursement statutes, regulations and policies by 68 Indiana hospitals and the Indiana Hospital Association, Inc., to which the 68 hospitals belong.

The hospitals claim that they are entitled to reimbursement of the portion of their return on equity capital and bad debt and charity costs that they claim are attributable to the Medicare patients they treat. The Medicare Act was passed in 1965. 42 U.S.C. §§ 1395, *et seq.* It provides for the reimbursement of the reasonable cost of providing services to Medicare beneficiaries. 42 U.S.C. § 1395f(b). The statutory definition of "reasonable cost" is found at 42 U.S.C. § 1395x(v)(1)(A). Pursuant to the Medicare Act, the Secretary of Health and Human Services (hereinafter "the Secretary") has promulgated regulations which define the concept of reasonable cost more fully. 42 U.S.C. § 1395hh; and 42 C.F.R. §§ 405.401–405.488.

The 68 plaintiff hospitals have all made claims for reimbursement for return on equity capital and bad debt and charity costs for a variety of fiscal years with the "fiscal intermediary" which acts as the agent of the Secretary pursuant to 42 C.F.R. § 405.-651. The fiscal intermediary which rules upon claims made by Indiana hospitals (termed "providers" under the Act) is Mutual Hospital Insurance, Inc. d/b/a Blue Cross of Indiana.

These plaintiffs filed claims ("Cost Reports") with Blue Cross. Blue Cross, by "Notices of Program Reimbursement" to each of the hospitals, denied payment under the Medicare Act for the return on equity, bad debt and charity claims. The hospitals then pursued the administrative appeals outlined by the Act and the Secretary's regulations. 42 U.S.C. § 1395oo(a); and 42 C.F.R. § 405.1837. The plaintiffs were granted permission to pursue their appeals as a group appeal, since their claims presented common questions of law.

The first level of appeal was to the Provider Reimbursement Review Board ("PRRB" or "Board" hereafter). The PRRB ruled that the hospitals were entitled to a return on equity, but sustained Blue Cross's denial of reimbursement for the bad debt and charity costs.

The Deputy Administrator of the Health Care Financing Administration, to whom the Secretary's power to review the PRRB's decisions has been delegated, reversed the Board's findings in regard to the return on equity issue and affirmed the decision to deny reimbursement of bad debt and charity costs.

The hospitals filed suit in district courts for judicial review of this decision. . . .

\* \* \*

*(3) Return on Equity Capital*

The return on equity issue has been raised in several other courts. The hospitals' basic contention is that they should be reimbursed by the Medicare program for a reasonable rate of return on their net assets used in the treatment of Medicare patients. The plaintiffs rest their argument on the following grounds: (A) the Deputy Administrator had no power to reverse the PRRB's decision to grant these plaintiffs return on equity costs, therefore the PRRB's decision is final, [not at issue on appeal] (B) great deference should be given to PRRB's decision, (C) a return on equity is a "reasonable cost" of providing services under 42 U.S.C. § 1395x(v)(1)(A), (D) the denial of reimbursement for these costs constitutes a violation of the just compensation clause of the Fifth Amendment, and (E) since proprietary (for-profit) hospitals are given a return on net assets reimbursement, these plaintiffs, nonproprietary hospitals, are being denied their rights to equal protection.

In order to understand the plaintiffs' arguments, it is necessary to review some background and legislative history of the Medicare program. The terms "return on equity," "return on equity capital," "return on net assets," and "imputed interest" are all used to describe the hospitals' claims of entitlement to reimbursement for the opportunity cost of capital used in the treatment of Medicare patients. Under Part A of the Medicare Act, 42 U.S.C. §§ 1395c–1395i–2, which provides hospital insurance benefits to qualified elderly and/or disabled recipients, hospitals are reimbursed for the "reasonable cost" of providing services to these recipients. The thrust of the plaintiffs' position in this case is that a return on equity is a reasonable cost under the Act and should be reimbursed. Title 42 U.S.C. § 1395x(v)(1)(A) initially defines reasonable cost, for provider reimbursement purposes, as:

(v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; . . . .

The section further provides the following principle which is to be used to determine whether costs are or are not reimbursable reasonable costs:

Such regulations shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs. . . .

The gist of the "necessary costs" requirement is that hospitals will be reimbursed for costs, either direct or indirect, which are attributable to Medicare patients. The Medicare Program is not to be responsible for costs incurred on behalf of non-Medicare patients. If indirect costs are attributable to both Medicare and non-Medicare patients, the provider will be reimbursed for the proportionate share of such indirect costs as are incurred for the benefits of the Medicare patients. 42 C.F.R. § 405.-451(b)(1) and (c)(3)

The Secretary of Health and Human Services has the responsibility for administering the Medicare Program. 42 U.S.C. § 1395kk. The Secretary is authorized by Congress to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this [subchapter]." 42 U.S.C. § 1395hh. These regulations are found in the Code of Federal Regulations, Subchapter B, Part 405 of 42 C.F.R. Chapter IV.

The regulations further delineate the types of costs which will be allowable under the Program. These regulations flesh out the general principles laid down in 42 U.S.C. § 1395x(v)(1)(A). One regulation which is at issue in this case, at least indirectly, is 42 C.F.R. § 405.429, which specifically authorizes a proportionate reimbursement for return on equity in the case of proprietary (for profit) hospitals.

§ 405.429 Return on equity capital of proprietary providers.

(a) *Principle.* (1) A reasonable return on equity capital invested and used in the provision of patient care is allowable as an element of the reasonable cost of covered services furnished to beneficiaries by proprietary providers. . . .

(2) For the purposes of this subpart, the term "proprietary providers" is intended to distinguish providers, whether sole proprietorships, partnerships, or corporations, that are organized and operated with the expectation of earning profit for the owners, from other providers that are organized and operated on a nonprofit basis.

(b) *Application*—(1) *Computation of equity capital.* Proprietary providers generally do not receive public contributions and assistance of Federal and other governmental programs in financing capital expenditures. Proprietary institutions historically have financed capital expenditures through funds invested by owners in the expectation of earning a return. A return on investment, therefore, is needed to avoid withdrawal of capital and to attract additional capital needed for expansion. . . .

Presumably for the reasons expressed in subsection (b), above, the Secretary has made no analogous provision for a return on investment costs in the cases of nonproprietary providers. The plaintiffs in this case are challenging the Secretary's disallowance of a proportionate share of their return on equity costs, primarily on the basis of their perception of the general spirit of 42 U.S.C. § 1395x(v)(1)(A) and on some legislative history.

The first Medicare Regulations, issued by the Secretary in 1966, authorized a reimbursement of an additional 2% of total allowable costs for nonproprietary facilities as compensation for otherwise unspecified costs. One of the costs included in the 2% was a return on equity capital. (See Proposed HEW Regulations, §§ 405.402(e) and 405.428(b) (1966); statements of the Commissioner of Social Security, Robert M. Ball in the *Hearings on Reimbursement Guidelines for Medicare Before the Senate Committee on Financing,* 89th Congress, 2d Sess., at 55–56 (1966), R. 0501–2; and Mr. Ball's comments in the *1966 Hearings* at 72 [R. 0508].) Proprietary hospitals were only given a 1-to-1½% additional reimbursement. The regulation expressly recognized that proprietary hospitals had already been given a return on equity capital reimbursement under § 1395x(v)(1)(B) and 42 C.F.R. § 405.429. 42 C.F.R. § 405.428 (formerly 20 C.F.R. § 405.428).

It is clear that the nonproprietary providers' 2% allowance did include a return on equity capital: it is equally clear that Congress heard discussion of the return on equity issue before these regulations were passed. The problems at issue for the nonproprietary hospital plaintiffs began in June, 1969, when the Secretary dropped both the 2% and the 1½% allowances. 34 Fed.Reg. 9927 (June 27, 1969). As a result, the nonproprietary providers are left with only the "reasonable cost" definition found in 42 U.S.C. § 1395x(v)(1)(A). Proprietary providers may still be reimbursed for return on equity capital costs pursuant to 42 C.F.R. § 405.429, the regulatory counterpart of § 1395x(v)(1)(A).

The plaintiffs in this case now contend that a return on equity is a "reasonable cost" and that it is anomalous to grant a return on equity capital reimbursement to proprietary but not to nonproprietary providers. The arguments which shore up their contention that Congress intended that all providers be reimbursed for return on equity expenses are based primarily on post-enactment legislative history and on more generalized arguments that this expense is a "reasonable cost" within the meaning of 42 U.S.C. § 1395x(v)(1)(A).

*       *       *

*(c) Is a Return on Equity Capital a Reasonable Cost for Nonproprietary Providers Under 42 U.S.C. § 1395x(v)(1)(A)?*

The stance of the Department of Health and Human Services on this issue is that nonproprietary providers may not recoup any Medicare funds for a return on equity. The rationale of the Deputy Administrator is that there is no regulation that authorizes the reimbursement, so if the hospitals are to recover these amounts, it must be done as a reasonable cost under § 1395x(v)(1)(A). The Department's analysis of this statute and its conclusions is set out in the Deputy Administrator's opinion in the group appeal now before the Court:

> It would appear that if a return on equity capital were paid to non-profit hospitals, Medicare would be paying a disproportionate share of provider costs. This is because the return is a profit rather than a cost. Under Section 1861(v)(1)(A) of the Act and the supporting regulations, Medicare reimburses all of a provider's reasonable costs in caring for Medicare beneficiaries. This includes a proportionate share of the cost of capital investment related to patient care such as a building or equipment.
>
> In this case, the Board found that non-profit providers need the funds from the return on equity capital for capital investment purposes, and to cover the costs of bad debts and charity allowances. However, under these circumstances, Medicare would be paying an amount in excess of its share of reasonable cost. This excess would be used to satisfy the burden of non-Medicare patients. This is contrary to the mandate in Section 1861(v)(1)(A) of the Act and the Board's finding in this regard is clearly erroneous. Based on the specific wording of Section 1861(v)(1)(B) of the Act and 42 CFR 405.-429, and the Congressional comments, the Deputy Administrator finds that a return on equity capital is not an element of reasonable cost for non-profit providers. It is not an out-of-pocket cost and was not the type of cost contemplated as reasonable, either direct or indirect, when Section 1861(v)(1)(A) was enacted. Section 1861(v)(1)(B) was enacted because under Section 1861(v)(1)(A) alone a return on equity capital could not be paid to proprietary providers. Therefore, the Board's reliance on Section 1861(v)(1)(A) in this regard is erroneous.

The Secretary's position in regard to 42 C.F.R. § 405.429 (quoted above, concerning return on equity for proprietary hospitals) is correct. The terms of this statute are explicit in the distinction between proprietary and nonproprietary providers insofar as the return on equity issue is concerned. (In accord, *Valley View Community Hospital v. United States*, 679 F.2d 857 (U.S.Ct. Cl.1982), ¶ 31,978, CCH Medicare and Medicaid Guide.) The rationale for the distinction expressed in the regulation is that proprietary providers must raise capital through funds invested by owners in the expectation of earning a profit. Alternatively, nonproprietary hospitals have other sources of funding, i.e., public contributions and governmental programs. *Id.* ¶ 31,978 Medicare and Medicaid Guide, at 9748. The plaintiffs have not brought forward any regulations which affirmatively authorize a return on equity for nonprofit hospitals. They are relegated to the very general reasonable cost standard defined in § 1395x(v)(1)(A).

As noted above, the Secretary's position is that the intent of Congress, as set forth in § 1395x(v)(1)(A), in light of its legislative history, is that a return on equity is not a reasonable cost. This is also the position of the courts which have viewed this issue.

The legislative history of the return on equity issue has been quoted exhaustively by both parties to this litigation. It has also been summarized in *Hospital Authority of Floyd County, Georgia v. Schweiker,* 522 F.Supp. 569 (N.D.Ga.1981) [, aff'd, 707 F.2d 456 (11th Cir.1983)].

The plaintiffs' argument that a return on equity is a reasonable cost under § 1395x(v)(1)(A) is not borne out by the legislative history. The bulk of the plaintiffs' authority is testimony from the transcript of the 1966 Senate Finance Committee hearings on the issue of reimbursement guidelines. These hearings were held nearly a year after the Medicare Act was passed by Congress. "Such post-enactment history is not the surest guide of the legislative intent in initially passing the Act. *Cf. Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074 (5th Cir.1980) [*cert. den., Moon v. Roadway Express, Inc.,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980)]. Nevertheless, the testimony of the witnesses and the remarks of the Senators are quite instructive." *Floyd County, supra,* 522 F.Supp. at [571].

The plaintiffs have placed great stock in statements made by Robert Ball, the Commissioner of Social Security, who agreed with the policy of including a return on equity factor in the 2% allowance, because giving a return on equity solely to proprietary hospitals would foster the "anomalous result" of "reimbursing a profit-making organization more than a nonprofit organization for rendering exactly the same service—solely by reason of allowing return on investment in one case but not the other." *Reimbursement Guidelines for Medicare: Hearing before the Committee on Finance,* United States Senate, 89th Cong., 2d Sess. (Comm. Print, May 25, 1966), at 56 (hereinafter "Hearings"). Mr. Ball and Mr. Willcox, the General Counsel of Social Security agreed that a return on investment was "some bit of this 2% item." *Id.,* at 107. "The Senate Committee, in short, was being told by the Commissioner [Mr. Ball] that no return on equity capital was allowed explicitly, but that a return on equity capital was discreetly included in the 2% allowance." *Floyd County, supra,* at 572.

The idea that even the proponents of a return on equity capital classified it as a portion of the 2% allowance rather than as an automatic "reasonable cost" is significant. Shortly after the hearings Congress amended the Act to provide explicitly for a return on equity to proprietary facilities. Title 42 U.S.C. § 1395x(v)(1)(B), the statutory counterpart of 42 C.F.R. § 405.429, provides:

> (B) Such regulations in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services, in lieu of other allowances to the extent that they reflect similar items [i.e., the 2% allowance]....

Section 1395x(v)(1)(B) and 42 C.F.R. § 405.429 remained after the 1969 decision to discontinue the 1½% and 2% allowances. The following lengthy portion of the *Floyd County* analysis of the legislative history reveals that the understanding of the Congress was that a return on equity was not provided in the original Act and that it was not within the ambit of a § 1395x(v)(1)(A) reasonable cost:

Having traced the footprints on the trail of legislative enactment, the Court concludes that it was not the intent of Congress to provide an allowance for a return on equity capital to all facilities. In reading the transcript of the Senate hearing, it is apparent that the Committee basically approved the Secretary's proposal to table the issue of providing such an allowance. This is what the Health Insurance Benefits Advisory Council recommended, and this recommendation was passed on to the Committee. The decision to amend the Act in October, 1966 to provide for the allowance for proprietary facilities evidences Congressional intent to reverse the former policy of simply obscuring the allowance as a "bit" of the 2% allowance.

The exchanges at the Hearing between various Senators and Mr. Ball and other administrative officials made it quite unequivocal that the Senate Committee mem-

bers believed that a return on equity capital was not, and should not, be provided. For example:

THE CHAIRMAN [Sen. Russell B. Long]. But did you have the impression anywhere that the congressional intent was that we should have allowed imputed interest on capital?

MR. MYERS [Chief Actuary, Social Security Administration]. No. In making the cost estimates, I had no thought that that would be done.

THE CHAIRMAN. What we are talking about is an item neither you nor we had any idea of allowing. I never had an idea we were going to allow imputed interest. Nobody, so far as I know, in your Department—did your Department have any idea that we were going to allow imputed interest?

MR. BALL. No, Mr. Chairman. And I think one of the main reasons that the staff resisted the tendency of the Health Insurance Benefits Advisory Council to move to this position was not necessarily on the merits of the economic argument, but the fact that it had not been considered, and that it therefore ought to be postponed. That was the thought there.

.    .    .    .    .

MR. BALL. Senator, I think the language of the law "reasonable cost" is open to a great variety of interpretations. The discussion, the legislative history, the committee report, pinned that down considerably.... I was answering literally the question of whether the term "reasonable cost" could have included such things [e.g. return on equity capital].

But I don't think it would have been reasonable to so interpret the term in the light of the discussions and the legislative history.

.    .    .    .    .

SENATOR WILLIAMS. In computing the costs incurred, how can you get an estimate for interest which is not owed, not paid? How can you get an allowance for an interest charge not owed and not paid, if you are going to stick to the formula of actual costs incurred?

MR. BALL. We did not accede to this argument for allowing an interest return on equity capital.

Hearings, 49–51.

MR. COHEN [Under Secretary]. I think the point, Senator, is that Congress did, in setting up the concept of reasonable cost, intend for us to reflect what the economic cost of hospital care was. And as Mr. Gordon says, if you were going to pay for the interest on borrowing the money it seems to us to be reasonable to try to reflect in the cost what is actually the incurred cost of a hospital when it has to operate. So while it was not discussed in those specific terms, I think it is absolutely consistent with the intent of Congress that what the program should pay should really reflect what the economic cost is for a hospital in providing these services.

SENATOR ANDERSON. I just could not disagree with you more. We discussed this over and over and over again, and rejected that in the committee. I just call your attention to the committee report, page 33:

The cost of hospital services varies widely from one hospital to another, and the variations reflect differences in quality and cost. The same thing is true with respect to the cost of services provided. The provision in this bill for the payment of reasonable cost of services is intended to meet the actual cost. "Actual." This is not economic or fanciful or anything else. We put it in there so they could not bring in the various things you are talking about now. How do you get around this?

MR. COHEN. Well I think this is the actual cost. I think when you are talking about economic costs—

.    .    .    .    .

SENATOR ANDERSON. Just one more question from page 37 of the report which I think should have some importance to you. I really believe when a committee goes to the extent of preparing a report, and filing it, and telling the Congress and the people that

this is what they mean, it is wrong to try to reinterpret it some other way.

In paying reasonable cost, it should be the policy of the insurance program to so reimburse a hospital or other provider that an accounting may be made at the end of each cost period for costs actually incurred.

Not beneficiarily incurred, or anything else— "actually incurred." And if you don't pay interest on a debt, that is not a cost that it actually incurred.

*id.* at 69–70.

At the outset of the hearing, Senator Long, the Chairman, outlined the various topics to be discussed:

Three. Can the reasonable cost include a return on investment for proprietary institutions without a similar payment to the nonprofit facilities. And that is a fair question to be raised. It seems to me that it was intended that there should be a return on investment to proprietary institutions—and that there is no similar requirement that they be made to public or nonprofit groups.

*id.* at 43.

In addition, when the Act was amended in October, Congressman John W. Byrnes of Wisconsin stated, "[Under existing law] the amount that will be paid to the individual nursing home or facility—shall be, and I quote, 'the reasonable cost' of furnishing such care. In other words, as the law now stands, fundamentally all the Social Security Administration can pay are the costs, with no allowance for profits or a return on the invested capital." 112 Cong.Rec. 28220 (1966). Senator Long made a similar statement to the Senate, "As the proposed Medicare regulations stood [an investor] would only have been reimbursed for the actual costs of providing services with no specific return given on his investment." 112 Cong. Rec. 27608 (1966).

*Floyd County, supra,* at 572–74.

This Court concludes, as did the district court for the Northern District of Georgia, *id.,* at 575, that a payment for a return on equity capital is not within the scope of

§ 1395x(v)(1)(A). The plaintiffs have brought forward no cases which stand as authority for the proposition that a return on equity is a § 1395x(v)(1)(A) reasonable cost. Rather, they have relied on: (1) the PRRB's decision, (2) general policy statements which assert that a policy of non-reimbursement for nonproprietary providers would violate the mandate of § 1395x(v)(1)(A) in that a heavier share of costs would be borne by non-Medicare patients, and (3) analogies to indirect costs which are reimbursed (i.e., straight line depreciation, 42 C.F.R. § 405.415, the 1966–1969 2% allowance, 20 C.F.R. § 405.428, interest on some loans, 42 C.F.R. § 405.[419], and return on net assets to proprietary hospitals, 42 C.F.R. § 405.429).

None of these arguments addresses the critical question: did the Secretary misconstrue the statute in denying a return on equity? Given the legislative history quoted above, it is clear that not only did Congress not consider a return on equity when it passed the Medicare Act, it specifically viewed this item during the 1966 Hearings as an expense which did not fall within the purview of § 1395x(v)(1)(A). When the 2% allowance, some "bit" of which was a return on equity, was abandoned in 1969, the expense, as to nonproprietary providers, returned to its status as a nonreimbursable expense. In light of its legislative history, 42 U.S.C. § 1395x(v)(1)(A) cannot be stretched to cover this item of cost.

Another district court which has considered the issue of whether a return on equity is a reasonable cost was recently upheld by the Court of Appeals for the District of Columbia Circuit. *American Medical International, Inc. v. Secretary of Health, Education and Welfare,* 466 F.Supp. 605 (D.D.C.1979), *aff'd,* 677 F.2d 118 (D.C. App.1981). In *American Medical International* the court discussed return on equity capital because the plaintiffs had analogized it to the stock maintenance costs for which they sought reimbursement. The district court stated:

Plaintiffs argue that stock maintenance costs, though related to investment, should be reimbursed because

Medicare allows proprietary providers a return on equity capital. 42 U.S.C. § 1395x(v)(1)(B). [Footnote omitted.] By allowing this payment, plaintiffs contend, the Medicare program expressly recognized that costs related to investment may be reimbursed. This argument assumes that the return on equity capital in § 1395x(v)(1)(B) is a reasonable cost within the meaning of § 1395x(v)(1)(A). However, this return on equity provision was added subsequent to the passage of the Medicare Act and it constitutes the sole exception to the basic Medicare principle that reimbursement be limited to those costs actually incurred in providing patient care services. It is clear from the purpose behind the return on equity provision (§ 1395x(v)(1)(B)), its legislative history, and the provision itself that the return on equity capital provision cannot be used by plaintiffs to support the position that reasonable costs under 42 U.S.C. § 1395x(v)(1)(A) was meant to include costs for investment.

*Id.,* 466 F.Supp. at 613. (In accord, *Valley View, supra.*)

Therefore, the Secretary did not misinterpret § 1395x(v)(1)(A), nor do the regulations conflict with the statutory scheme. Although the plaintiffs' policy arguments might have been convincing during the initial stages of legislative debate on the Medicare legislation, they were not accepted by Congress. It is beyond the province of the Court to do more than discern the will of Congress on this issue. A return on equity was not within the definition of reasonable cost originally. Since Congress has done nothing to change the statute in the 13 years since the demise of the 2% allowance, this Court cannot proclaim a return on equity capital to be a § 1395x(v)(1)(A) reasonable cost.

*(d) Does the Statutory or Regulatory Scheme Violate the Just Compensation Provision of the Fifth Amendment?*

The plaintiffs contend that if the statutory or regulatory schemes deny a return on equity to nonproprietary providers, they are constitutionally infirm. The hospitals urge that such provisions would violate the Fifth Amendment's mandate that "private property ... [not] be taken for public use without just compensation." The plaintiffs have presented the Court with no cases which support this position. They urge that being denied compensation for the opportunity cost of the assets used in furnishing care to Medicare patients is unjust compensation. If the United States does not pay them for the opportunity cost, the plaintiffs claim that the government is not compensating them sufficiently for property it has taken.

These opportunity cost arguments go to the compensation element and do not need to be answered since the "taking" element of the just compensation clause has not been violated. The plaintiffs have stated that the hospitals are in positions akin to those of public utilities. (Relying on *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).) The basic principle of *Smyth,* as stated by the plaintiffs, is that when a business dedicates a portion of its property to activities deemed to be affected with a public interest, the Constitution guarantees that the property will not be used for the public benefit without just compensation being paid for the services rendered.

There has been no taking in this case. The utilities cases relied upon by plaintiffs are analogous to the case at bar, but there are important distinctions which prevent the application of the just compensation clause to this issue. *Smyth* was a case in which the state regulated railroad charges. The parties in *Smyth* were railroads and stockholders of railroads, which were for-profit corporations. The plaintiffs in the instant case are non-profit hospitals: the payment distinctions on the return on equity issue are made on the basis of the differences between profit-making and nonprofit organizations (see 42 C.F.R. § 405.429 and the equal protection discussion below.)

The Court identified as unconstitutional takings of property in which property is "wrested" from its owner for the benefit of another or for the public. *Id.,* 169 U.S. at 524–25, 18 S.Ct. at 425, 42 L.Ed. at 841.

The prohibition was against "a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business...." *Id.,* 169 U.S. at 525, 18 S.Ct. at 425, 42 L.Ed. at 841. This "wresting away" and "practically destroying the value of the property" has evolved into a standard which demands at a minimum some loss of use.

The plaintiffs in this case have not demonstrated this type of loss. They have volunteered to participate in the Medicare program. They can terminate their participation now. They may sell their physical plant at any time.

A district court for the Eastern District of New York recently dealt with the just compensation clause's "taking" requirement in a similar case involving Medicaid reimbursement provisions. *Hempstead General Hospital v. Whalen,* 474 F.Supp. 398 (E.D.N.Y.1979), *aff'd without opinion,* 622 F.2d 573 (2 Cir.1980). The plaintiffs in that case challenged federally approved state limitations on capital cost reimbursements to potential purchasers of health care facilities. They contended that these capital reimbursement limitations constituted a taking because they eliminated many potential buyers of health care facilities. The Medicaid regulations at issue limited capital reimbursement of purchasers to the net depreciated value of the property rather than to either the purchase price or the fair market value. After reviewing the recent just compensation cases, the Court held that there was no taking in spite of the fact that there was a greatly lessened market for hospital facilities and the regulations "impose upon plaintiffs a constantly diminishing potential sale price." *Id.,* 474 F.Supp. at 411.

The reasoning of the *Hempstead* court for the finding of no taking is that critical elements of governmental invasion were missing:

> As before, plaintiffs have full right to use the medical center property. The challenged regulations impose no direct legal restraint upon the property or upon its use. There has been no physical entry by the state, no ouster of the owner, no legal interference with plaintiffs' physical use, possession or enjoyment of the medical center, nor any legal interference with the owner's power of disposition of the property.

*Id.,* at 410–11.

The New York court held that the regulations did not constitute a *de facto* taking, which requires a "physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property." *Id.,* at 410, citing *City of Buffalo v. J.W. Clement Company,* 28 N.Y.2d 241, 253; [321 N.Y.S.2d 345, 357; 269 N.E.2d 895, 903] (1971). Neither did the regulations come within the ambit of the cases which deal with unconstitutional regulation of utilities since the plaintiffs "have not lost any existing right of property or contract." *Hempstead, supra,* at 410. Within the context of the utility overregulation cases, the court set forth the following rule:

> Many kinds of legislative and administrative action affect property values, but, without some diminution in the owner's right of use, do not constitute a taking within the purview of the Fourteenth Amendment. *Chacon v. Granata,* 515 F.2d 922, 925 (CA5 1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975).

*Id.*

The instant case also lacks elements necessary for a taking. The return on equity rules may not be what the hospitals would design for themselves, but since these plaintiffs retain full rights and control over their net investment, the statutory scheme is not constitutionally deficient.

*(d) Does the Statutory or Regulatory Scheme Violate the Equal Protection Clause of the Fifth Amendment?*

The plaintiffs claim that the Fifth Amendment is violated if the Medicare statutes and regulations allow or disallow a return on equity solely on the basis of whether a provider is proprietary or non-

proprietary. This equal protection argument can only be proved under the Fifth Amendment if the discrimination is "so unjustifiable as to be violative of due process." *Shapiro v. Thompson,* 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600, 619 (1969); *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218, 222 (1964). Therefore, the due process clause of the Fifth Amendment guarantees equal protection. *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 533 n. 5, 93 S.Ct. 2821, 2825 n. 5, 37 L.Ed.2d 782, 787 n. 5 (1973).

The plaintiffs have attempted to support its claims that this distinction is discriminatory with statements by Robert Ball (the "anomalous result" testimony from the *Hearings,* quoted above), a 1966 Memorandum of the Comptroller General of the United States in favor of the 2% allowance and unsupported assertions that the distinction between proprietary and nonproprietary providers is neither rational nor reasonable insofar as the return on equity issue is concerned.

The standard to be applied in cases in which the constitutionality of a social welfare program is challenged is the same low level of scrutiny that is applied to legislation regulating business. *Weinberger v. Salfi,* 422 U.S. 749, 771–72, 95 S.Ct. 2457, 2469–70, 45 L.Ed.2d 522, 542–43 (1975). *Salfi* cited with approval social welfare legislation cases (*Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); and *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)) which "establish that a statutory classification violates due process only if it is 'patently arbitrary ..., utterly lacking in rational justification.' 363 U.S. at 611 [80 S.Ct. at 1372]. They establish that a classification violates equal protection only if it lacks a reasonable basis; there is no violation merely because the classification is 'imperfect,' or ' "not made with mathematical nicety or because in practice it results in some inequality." ' 397 U.S. at 485–86 [90 S.Ct. at 1161–62]."

*Caylor-Nickel Hospital, Inc. v. Califano,* Civil No. F 77–83 (N.D.Ind. Sept. 10, 1979) ¶ 30,718, CCH Medicare and Medicaid Guide. In *Caylor-Nickel,* Judge Eschbach, with specific reference to the return on equity provisions, held that the regulations which "provide for profit institutions but not to nonprofit institutions" are sufficiently rationally based to satisfy *Salfi. Id.,* ¶ 30,718, Medicare and Medicaid Guide at 9098. The reasons for this finding of sufficient rationality to sustain the constitutionality of the statutory and regulatory scheme are that:

> It is certainly rational that profit institutions receive this advantage when nonprofit institutions receive numerous other advantages, such as various grants and contributions, and tax-exempt status. The purpose and rationality of this classification is made clear in 42 U.S.C. § 1395x(v)(1)(A) and in the legislative history .... The distinction drawn between profit and nonprofit institutions violates nothing in the fifth amendment. *See Am. Med. Int'l, Inc. v. Sec. of H.E.W.,* 466 F.Supp. 605, 615 (D.C.Dist.Columb. 1979).

Other cases which have accepted the rationality of the distinction between proprietary and nonproprietary providers in the context of equal protection challenges are *Valley View, supra; Stevens Park Osteopathic Hospital, Inc. v. United States,* 633 F.2d 1373 (Ct.Cl.1980); and *Floyd County, supra.* Another explanation of the rationality of this distinction, which relies upon the section of Judge Eschbach's opinion quoted above, states:

> Both the Senate Finance Committee staff report and G.A.O. report outline various reasons why profit and nonprofit institutions should be treated differently. Nonprofit institutions have various benefits which are unavailable to proprietary institutions: tax benefits, Hill-Burton grants, charitable donations, and numerous other advantages created by the state and federal governments.

*Floyd County, supra,* 522 F.Supp. at 575–76.

The plaintiffs have brought forward no cases which refute these findings of rationality. The Court must agree that the distinction between proprietary and nonproprietary providers is rationally based.

All of the plaintiffs' return on equity capital claims fail. As to these issues, the Court must grant the defendant's motion for summary judgment.

*(4) Bad Debts and Charity Costs*

The hospitals ask the Court either to declare a regulation with respect to bad debts, charity, and courtesy allowances to be inconsistent with the "reasonable cost" requirement of § 1395x(v)(1)(A), or to rule that it violates the due process clause of the Fifth Amendment. The hospitals claim that because bad debts and charity not attributable to Medicare patients are categorized by accountants as economic costs of running a hospital, the Medicare program should reimburse them for a proportionate share of these costs.

The Secretary has great leeway to formulate standards for the determination of which are "reasonable costs" under 42 U.S.C. § 1395x(v)(1)(A). In 1966, the Secretary promulgated the following regulation, now challenged by the plaintiffs:

§ 405.420 Bad debts, charity, and courtesy allowances.

(a) *Principle.* Bad debts, charity, and courtesy allowances are deductions from revenue and are not to be included in allowable cost; however, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the program.

(b) *Definitions*—(1) *Bad debts.* Bad debts are amounts considered to be uncollectible from accounts and notes receivable which were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the rendering of services, and are collectible in money in the relatively near future.

(2) *Charity allowances.* Charity allowances are reductions in charges made by the provider of services because of the indigence or medical indigence of the patient.

(3) *Courtesy allowances.* Courtesy allowances indicate a reduction in charges in the form of an allowance to physicians, clergy, members of religious orders, and others as approved by the governing body of the provider [, for services received from the provider]. Employee fringe benefits, such as hospitalization and personnel health programs, are not considered to be courtesy allowances.

(c) *Normal accounting treatment: Reduction in revenue.* Bad debts, charity, and courtesy allowances represent reductions in revenue. The failure to collect charges for services rendered does not add to the cost of providing the services. Such costs have already been incurred in the production of the services.

. . . .

(g) *Charity allowances.* Charity allowances have no relationship to beneficiaries of the health insurance program and are not allowable costs. The cost to the provider of employee fringe-benefit programs is an allowable element of reimbursement.

From the above it will be noted that plaintiffs are specifically allowed to collect every penny of bad debts attributable to the deductibles and coinsurance amounts which Medicare patients fail to pay. In other words, payments are reduced in the first instance by applicable deductibles and coinsurance amounts, 42 U.S.C. § 1395e; 42 C.F.R. § 405.110(b). Notwithstanding such fact, the amount of these reductions is eventually paid to plaintiffs to the extent that plaintiffs are not otherwise able to collect the same. 42 C.F.R. § 405.420(a). Since the exact amount of the bad debts incurred by Medicare patients in the foregoing areas is reimbursed, it is logical to deny reimbursement, either directly or as an item of overhead, of similar losses of revenue attributable to non-Medicare patients, in keeping with the congressional policy as expressed in 42 U.S.C. § 1395x(v)(1)(A).

\* \* \*

The Congress has said that costs attributable to non-Medicare patients are not to be

borne by the Medicare program. All of the items excluded by 42 C.F.R. § 405.420(a) are just such costs or, more accurately, lack of revenue. The challenged regulation appears to be in complete harmony with both the letter and the spirit of the statute, and the decision of the Board with respect thereto is correct.

... The final decision of the Secretary is affirmed, and summary judgment will be rendered in favor of the defendants in the consolidated cases.

Dated this 12 day of August, 1982.

/s/ S. HUGH DILLIN

_____

S. Hugh Dillin, Judge.